Curtis W. CAINE, Jr., M.D.,
Plaintiff–Appellant,

v.

M.D. HARDY, M.D., et al.,
Defendants–Appellees.

No. 89–4470.

United States Court of Appeals,
Fifth Circuit.

Sept. 26, 1991.

Paul M. Neville, Jackson, Miss., Kent Masterson Brown, Lexington, Ky., for plaintiff-appellant.

George O. Evans, Wise, Carter, Child, Caraway, Douglas E. Levanway, George H. Ritter, Jackson, Miss., for defendants-appellees.

Before CLARK, Chief Judge, BROWN, POLITZ, KING, WILLIAMS, GARWOOD, JOLLY, HIGGINBOTHAM, DAVIS, JONES, SMITH, DUHÉ, WIENER, and BARKSDALE, Circuit Judges.[1]

EDITH H. JONES, Circuit Judge:

An anesthesiologist's clinical privileges at a public hospital were suspended with conditions after an investigation and conferences concerning the death of one of his patients, but before a formal hearing was held. This court must now decide *en banc* whether the doctor's discipline followed the dictates of procedural due process. To a reasonable layman, there would be no dilemma: after a patient died while under the anesthesiologist's care, suspension pending a hearing would seem an obvious answer. Constitutional law does not, however, always deal in the obvious. We reach the same conclusion as the intuitive one, but after following paths well rutted by decisions of the Supreme Court.

## I. BACKGROUND

Dr. Curtis W. Caine, Jr. filed suit in the United States District Court for the Southern District of Mississippi against nearly two dozen defendants, including the administrator and all the members of the Executive Committee and the Board of Trustees of Hinds County General Hospital, alleging the denial of procedural due process occasioned by the swift suspension of his clinical privileges. To his fifty-page complaint Dr. Caine attached 250 pages of exhibits described as "true and correct copies" of the relevant documents. The hospital staff bylaws and virtually every letter or report pertinent to Dr. Caine's suspension proceedings, whether prepared on his behalf or by hospital personnel, were appended in neat chronological order. They tell a tale that mirrors most of the facts, if not the legal characterizations, espoused in the complaint.

On April 7, 1988, defendant Dr. M.D. Hardy, the Chief of Anesthesiology of Hinds General, asked Dr. Caine to discuss a certain patient who had been under Dr. Caine's care two months earlier. Dr. Caine then met twice, for a total of three hours, with Drs. Hardy, Strong, and Courtney, all anesthesiologists and members of the Ad Hoc Investigating Committee previously appointed to review the treatment of the patient in question. When his lawyer advised him that the first meeting was inadequate, Dr. Caine requested and obtained the second meeting. Less than a week after the second meeting with Dr. Caine, the Ad Hoc Investigating Committee reported to the hospital's Executive Committee that Dr. Caine's handling of the case exhibited serious deficiencies. Although each member of the Ad Hoc Committee recommended a different sanction, the most clement of these called for immediate and continued suspension of Dr. Caine's clinical privileges pending his completion of

---

1. Judge Emilio M. Garza became a member of the Court after this case was heard *en banc* but elected not to participate in the decision; Judge Sam D. Johnson took senior status after the case was heard but before this opinion was rendered and did not participate in the decision of this case. *See United States v. Anderson,* 885 F.2d 1248, 1249 (5th Cir.1989) (*en banc*).

a six-month course of additional anesthesiology training.

Three days later, on April 25, the Executive Committee—composed of two members of the Ad Hoc Committee and nine other non-anesthesiology staff doctors—discussed the Ad Hoc Committee's written reports. The minutes of the Executive Committee meeting list five alleged critical errors in Dr. Caine's management of the patient. Unanimously, the Committee suspended Dr. Caine's clinical privileges immediately, but offered him the opportunity to reapply for them when he completed a twelve-month anesthesiology residency and agreed to submit to a three-month probationary status at Hinds General.

The Executive Committee specified in its written notice that it took this action pursuant to Article VI, Section 2(a) of the medical staff bylaws.[2] It advised Dr. Caine of

2. Hinds County General Hospital, *Medical Staff Bylaws, Rules and Regulations* (1987).

3. The bylaws provide in relevant part:

### ARTICLE VI.
### CORRECTIVE ACTION
*Section 1:* Procedure.
a. Whenever ... any member of the Medical Staff ... has cause to question, with respect to an individual holding a current Medical Staff appointment:

  .   .   .   .   .

(2) His care or treatment of a patient or patients or his management of a case;

  .   .   .   .   .

a written request for an investigation shall be addressed to the Executive Committee making specific reference to the activity or conduct which gives rise to the request....
b. The Executive Committee shall forward any requests for corrective action to the Section Chief of the Clinical Section in which the questioned activity or conduct occurred, and to the Chief of Staff. The Chief of Staff shall immediately appoint a three member ad hoc committee consisting of members of the Clinical Section or department affected to investigate the matter. Within twenty (20) days after the receipt of the request for corrective action, the committee shall forward its written report of the investigation to the Executive Committee. Prior to the making of any such report that would recommend probation, reduction, suspension or revocation of clinical privileges, ... the practitioner against whom corrective action has been requested shall have an opportunity for an interview with the ad hoc investigative committee. At

his right, under Article VII of the bylaws, to request a formal hearing. On May 4, Dr. Caine so requested. He did not, however, accept the hospital's offer to convene the hearing within seven days, but instead requested and received two continuances. Eventually, after a hearing had been set for sometime in July, he categorically declined to participate in the hospital's post-suspension procedures. The bylaws would have afforded not only a formal hearing before an ad hoc hearing committee, but also an appeal to the Board of Trustees. Dr. Caine also chose not to take advantage of his right to judicial review of the hospital's decision in the Mississippi chancery court. *See* Miss.Code Ann. § 73–25–95 (incorporating *id.* § 73–25–27).

In form, the hospital followed every step of its medical staff bylaws both before and after Dr. Caine's suspension.[3] Specifically,

such interview, the affected practitioner shall be informed of the general nature of the charges against him, and shall be invited to discuss, explain or refute them....
c. Within ten (10) days following the receipt of the report of the ad hoc committee, the Executive Committee shall take action upon the request. Such action may include, without limitation:

  .   .   .   .   .

(4) Recommending reduction, suspension or revocation of clinical privileges;

  .   .   .   .   .

d. Any action by the Executive Committee as described [above] shall entitle the practitioner to the procedural rights as provided in Article VII.

  .   .   .   .   .

*Section 2:* Summary Suspension.
a. Whenever a practitioner willfully disregards these By-laws or other Hospital policies, or whenever his conduct requires that immediate action be taken to protect the life of any patient(s) or to reduce the substantial likelihood of immediate injury or damage to the health or safety of any patient, ... the Executive Committee of the Medical Staff shall have the authority to summarily suspend ... the clinical privileges of such practitioner....

  .   .   .   .   .

c. Unless the Executive Committee [no later than five (5) days from the date of such summary suspension] recommends immediate termination of the suspension and cessation of all further corrective action, the practitioner shall be entitled to the procedural rights provided in Article VII of the By-laws....

  .   .   .   .   .

Dr. Caine was suspended by the Executive Committee for conduct that "requires that immediate action be taken to protect the life of any patient(s) or to reduce the substantial likelihood of immediate injury or damages to the health or safety of any patient." Article VI, Section 2(a).

Dr. Caine does not deny that the Executive Committee invoked and relied on Article VI, Section 2(a) in his case. His complaint, however, shines a different light on the formalities observed. Dr. Caine alleges that his troubles were unleashed by his then-recent opposition to Dr. Hardy's proposal to obtain for himself and his two partners an exclusive anesthesiology contract with the hospital, a contract that would have frozen out all other anesthesiologists. To punish Dr. Caine's stance— and his unsuccessful candidacy against Dr. Hardy for Chief of the Anesthesiology Department—Drs. Hardy, Courtney, and Strong allegedly failed to give Dr. Caine proper notice of the charges against him

prior to his April 11 and 16 meetings and refused him sufficient access to the relevant patient chart. Finally, Dr. Caine alleges that all the decisionmakers in his case were biased by their self-interest or by the gossip campaign mounted by Dr. Caine's detractors. He contends that nothing less than a formal pre-suspension hearing, before doctors not associated with Hinds General, was constitutionally required. To supplement his procedural due process claim, Dr. Caine proposed to amend his complaint to assert that he was disciplined in violation of his first amendment right to speak out on the exclusive anesthesiology contract as a matter of "public concern."

The district court granted the defendants' motion to dismiss the complaint under Fed.R.Civ.P. 12(b)(6). On the procedural due process issue, the court found that even if Dr. Caine's allegations against the defendants were true, they failed to allege that Mississippi law afforded an inadequate post-deprivation remedy for the suspension

### ARTICLE VII.
### HEARING AND APPELLATE REVIEW PROCEDURE

*Section 1.* Right to Hearing and to Appellate Review.
a. Whenever any individual receives notice of a recommendation of the Executive Committee that, if ratified by decision of the Board of Trustees, will adversely affect ... his/her exercise of clinical privileges, he/she shall be entitled to a hearing before an ad hoc committee of the Medical Staff. If the recommendation of the Executive Committee following such hearing is still adverse to the affected individual, he/she shall be entitled to an appellate review by the Board of Trustees before it makes a final decision on the matter.

*Section 4.* Composition of Hearing Committee.
a. When a hearing relates to an adverse recommendation of the Executive Committee, such hearing shall be conducted by an ad hoc hearing committee consisting of five (5) members of the Medical Staff appointed by the Chief of Staff in consultation with the Executive Committee.... No staff member who has actively participated in the consideration of the adverse recommendation shall be appointed as a member to this hearing committee.... Further, no staff member who is in direct economic competition with the Medical Staff member involved shall be appointed as a member to this hearing committee.

*Section 5.* Conduct of Hearing.

e. The affected individual shall be entitled to be accompanied by and/or represented at the

hearing by a member of the Medical Staff in good standing, or by a member of his local professional society....

h. Each party shall have the following rights: To call and examine witnesses, to introduce written evidence, to cross-examine any witness or any matter relevant to the issue of the hearing, to challenge any witness and to rebut any evidence....

j. Within twenty (20) days after final adjournment of the hearing, the hearing committee shall make a written report and recommendation and shall forward the same together with the hearing record and all other documentation to the Executive Committee.... The report may recommend confirmation, modification or rejection of the original adverse recommendation of the Executive Committee....
k. Within twenty (20) days after the receipt of the report of the hearing committee, the Executive Committee ... shall consider the same and render its decision....

*Section 6.* Appeal to the Board of Trustees.
a. Within ten (10) days after receipt of a notice by an affected individual of an adverse recommendation or decision made or adhered to after a hearing as provided, he/she may ... request an appellate review by the Board of Trustees.

of his privileges at Hinds General. The court rejected Dr. Caine's proposed first amendment claim because, again assuming the truth of the doctor's allegations, the court disagreed that the doctor had engaged in constitutionally protected speech. On initial appeal, a panel of our court held that under the Supreme Court's most recent procedural due process decision, *Zinermon v. Burch,* 494 U.S. 113, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990), Dr. Caine's allegations, if true, would support a judgment that his due process rights were violated. The divided panel also held that the district court must consider the first amendment claim on remand.

Having reconsidered this case *en banc,* our court now holds that Dr. Caine's complaint does not allege a procedural due process violation and that the district court did not err in refusing his proffered first amendment claim. We therefore affirm the district court's judgment.

## II. MOOTNESS

Before addressing the merits, we must dispose of an unfortunate preliminary issue. After this case was reargued *en banc,* Dr. Caine died of a heart attack. Dr. Caine's counsel moved to revive the action in the name of Dr. Caine's personal representative. To the contrary, the defendants argue that Dr. Caine's death abates the lawsuit and moots this appeal. After researching the issue, we agree with the plaintiff and conclude that the case as a whole is not moot.

■ Obviously, Dr. Caine's quest for reinstatement of his medical privileges does not survive his death. Whether his prayer for money damages survives, on the other hand, is not such an easy question. The Supreme Court has held that the survival of actions brought pursuant to 42 U.S.C. § 1983 is to be determined by the law of the forum state. *Robertson v. Wegmann,* 436 U.S. 584, 98 S.Ct. 1991, 56 L.Ed.2d 554 (1978). The relevant Mississippi statute provides: "When either of the parties to

any personal action shall die before final judgment, the executor or administrator of such deceased party may prosecute or defend such action, and the court shall render judgment for or against the executor or administrator." Miss.Code Ann. § 91-7-237. Whether Dr. Caine's lawsuit survives depends on whether it is a "personal action."

The Mississippi courts have long defined a personal action as "an action brought for the recovery of personal property, for the enforcement of a contract or to recover damages for its breach, or for the recovery of damages for the commission of an injury to the person or property." *Powell v. Buchanan,* 245 Miss. 4, 8, 147 So.2d 110, 111 (1962). One way to apply this definition to § 1983 actions is to examine the facts of each separate § 1983 claim and characterize it according to the most analogous state-law cause of action. In his procedural due process claim, Dr. Caine alleged that the defendants performed their actions "wantonly, willfully and maliciously, and with the intent to remove Plaintiff from the Medical Staff of Hinds General Hospital and to undermine and destroy his practice of anesthesiology and medicine." These allegations seem analogous to claims for wrongful discharge and defamation. Dr. Caine's proposed first amendment claim, alleging that he was fired for exercising his right to free speech, is also best characterized as a wrongful discharge claim.

■ Actions for defamation are not personal actions for purposes of the survival statute. *See Catchings v. Hartman,* 178 Miss. 672, 680, 174 So. 553, 554 (1937) ("[T]he action of slander is not a personal action within the strict interpretation which the statute must now receive."); *cf. Mitchell v. Random House, Inc.,* 703 F.Supp. 1250, 1255 n. 5 (S.D.Miss.1988) (relying on *Catchings* ), *aff'd,* 865 F.2d 664 (5th Cir. 1989). On the other hand, we conclude that wrongful discharge, were it recognized as a viable action in Mississippi, would be a personal action.[4] *Perry v.*

---

4. As recently as 1987, the Mississippi Supreme Court found no occasion to overrule the common-law doctrine of employment-at-will and create a tort action for wrongful discharge. *See*

*Sears, Roebuck & Co.,* 508 So.2d 1086, 1089 (Miss.1987), noted that "[w]rongful discharge actions ... essentially sound in tort, although some theories have attributes associated with both contract and tort." Described this way, wrongful discharge would seem to be an action "to recover damages for [a contract's] breach, or for ... an injury to the person" within the scope of § 91–7–237. Under this analysis, then, that part of Dr. Caine's § 1983 action for damages resulting from the act of wrongful suspension itself survives Dr. Caine's death.

Another way to apply the definition of personal action is to make a single federal characterization of all § 1983 actions for survival purposes. *See Wilson v. Garcia,* 471 U.S. 261, 276, 105 S.Ct. 1938, 1947, 85 L.Ed.2d 254 (1985) (for limitations purposes, all § 1983 claims should be characterized as "tort action[s] for the recovery of damages for personal injuries"). If we transplant *Wilson*'s holding to the survival context, it is easy to conclude that all § 1983 actions are actions "for the recovery of damages for the commission of an injury to the person" within the scope of § 91–7–237. Thus, Dr. Caine's lawsuit would also survive under this analysis. Because "[a] determination by this Court of the legal issues tendered by the parties" will certainly "affect the rights of litigants in the case before [us]," this case is not moot. *DeFunis v. Odegaard,* 416 U.S. 312, 316, 317, 94 S.Ct. 1704, 1705, 1706, 40 L.Ed.2d 164 (1974) (per curiam). Accordingly, we turn to the merits.

### III. PROCEDURAL DUE PROCESS

■ The Constitution guarantees that life, liberty, or property will not be taken by the government without due process of law. U.S. Const. amend. XIV, § 1. Procedural due process considers not the justice of a deprivation, but only the means by which the deprivation was effected. Because Dr. Caine could not be dismissed without just cause, his tenure on the Hinds General medical staff was a property interest recognized by the Constitution. *Darlak v. Bobear,* 814 F.2d 1055, 1061 (5th Cir.1987) (citing cases). Thus, the parties' dispute centers on whether the procedure employed in Dr. Caine's suspension was constitutionally adequate. We are convinced that it was.

Integral to our analysis is the concession that Dr. Caine was sanctioned under the bylaw authorizing quick action by the hospital to protect the lives of patients.[5] While Dr. Caine's brief and pleadings do not deny the resort to Article VI, Section 2(a), neither do they squarely confront its ramifications. Their vigorous argument for more pre-suspension process may mean either that informal procedures are never constitutional in this type of case or that the informal procedures used here were fatally tainted by bias, lack of notice, and departure from the hospital's regulations. In either case, we must disagree.

Procedural due process is a flexible concept whose contours are shaped by the

---

*Perry v. Sears, Roebuck & Co.,* 508 So.2d 1086, 1089–90 (Miss.1987) (declining to reconsider *Kelly v. Mississippi Valley Gas Co.,* 397 So.2d 874 (Miss.1981)). We note, however, that a federal district court in a diversity case held that the state supreme court "would recognize a limited public policy exception to the ·employment-at-will rule." *Laws v. Aetna Finance Co.,* 667 F.Supp. 342, 348 (N.D.Miss.1987).

5. Although we must assume the truth of Dr. Caine's allegations for purposes of reviewing the court's Rule 12(b)(6) dismissal, those allegations must be read in tandem with the vouchsafed exhibits attached to Dr. Caine's complaint. *See Zinermon,* 110 S.Ct. at 979.

The dissent asserts that as a result of our analysis, Rule 12(b)(6) is a dead letter because we have effectively drawn factual inferences

against Dr. Caine, rather than assuming the truth of his allegations. C. Wright, Federal Courts, 3d Ed. § 68. This hyperbole is incorrect. Dr. Caine's complaint nowhere took issue with the original ground for the investigation against him, the death of one of his patients. This fact is clearly stated in the documents attached to his petition. It is our position that this fact invokes the "public safety" rationale for truncated predeprivation process followed by an adequate post-suspension remedy. *Zinermon,* 110 S.Ct. at 984. We continue to assume that bias infected the outcome of the investigation but, given the exigent circumstances, that defect does not change the due process analysis. To hold otherwise would eviscerate the public safety component of due process analysis.

nature of the individual's and the state interests in a particular deprivation. Ordinarily, government may effect a deprivation only *after* it has accorded due process, but the necessary amount and kind of predeprivation process depends upon an analysis of three factors:

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976). Though the state must, for instance, accord a public employee "some kind of hearing" before termination, this may consist of no more than a meeting at which the employer states the grounds for dismissal and gives the employee an opportunity for rebuttal. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546, 105 S.Ct. 1487, 1495, 84 L.Ed.2d 494 (1985). The brief pre-termination hearing is satisfactory so long as it is coupled with more formal post-termination proceedings, for this allocation of the burden of a hearing protects both the employee and the employer's interest in maintaining an efficient workplace.

Not even an informal hearing, however, must precede a deprivation undertaken to protect the public safety. Starting with a case that authorized summary confiscation of potentially contaminated food products, *North Am. Cold Storage Co. v. City of Chicago*, 211 U.S. 306, 29 S.Ct. 101, 53 L.Ed. 195 (1908), the Supreme Court has consistently held that "the necessity of quick action by the State" justifies a summary deprivation followed by an adequate post-deprivation remedy. *Parratt v. Taylor*, 451 U.S. 527, 539, 101 S.Ct. 1908, 1915, 68 L.Ed.2d 420 (1981), *overruled in part not relevant here, Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986); *see also Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 436, 102 S.Ct.

1148, 1158, 71 L.Ed.2d 265 (1982); *Zinermon*, 110 S.Ct. at 984.

In a case strikingly similar to this one, our court applied these principles and concluded that a doctor's temporary suspension from a hospital staff, followed by an opportunity for a more formal hearing later, comported with due process. *Darlak v. Bobear*, 814 F.2d at 1062–63. As in *Darlak*, Dr. Caine had the opportunity to defend himself twice before the Ad Hoc Investigating Committee prior to his temporary suspension. As in *Darlak*, Dr. Caine could have invoked, but did not, the right provided by Article VII of the hospital bylaws to a formal post-suspension hearing within seven days of the Executive Committee's summary action. Thus, because Dr. Caine was summarily suspended under exigent circumstances, it is plain that the *Mathews* balancing test forecloses any procedural due process claim. *See Darlak*. Due process does not require an extensive formal hearing prior to a summary suspension of medical privileges, so long as an adequate post-termination remedy exists.

In pursuit of his claim, Dr. Caine cites not *Darlak*, but *Zinermon v. Burch*, asserting that this recent Supreme Court decision demonstrates constitutional flaws in his suspension. *Zinermon* took aim at a split in the courts of appeals over the application of the *Parratt/Hudson* doctrine, which provided that a "random, unauthorized" deprivation would not violate procedural due process if the state furnished an adequate post-deprivation remedy. *See Zinermon*, 110 S.Ct. at 977–78 (citing *Parratt, supra*, and *Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)). The genesis of *Parratt/Hudson* lay in the insight that "the State cannot be required constitutionally to do the impossible by providing predeprivation process" to stem aberrant, unpredictable conduct. *Id.* 110 S.Ct. at 985.

Dr. Caine poses the question whether *Zinermon* requires us to look again at the sufficiency of pre- and post-suspension procedures made available to him if, as he alleges, the decisionmakers deliberately

misused those procedures. Put otherwise, Dr. Caine contends that after *Zinermon,* the *Parratt/Hudson* doctrine cannot salvage the denial of due process inherent in biased decisionmaking.

The easy answer to these questions is that *Zinermon* simply does not apply. We have found that Dr. Caine stated no claim for denial of procedural due process. His assertion that he was the victim of partisan decisionmaking is of no moment. He is stating no more than that the risk of erroneous decision presented by the participation of his competitors in the decision to suspend his privileges was unacceptable. The *Mathews v. Eldridge* balance has, however, answered that assertion—concluding that this is a tolerable risk when compared with the state's powerful interest in protecting patient safety. The State of Mississippi has provided Dr. Caine all the process that is due. The state has no constitutional duty to provide a procedural regimen that guarantees faultless decisionmaking; the state's interests in safety and efficiency find expression in the tolerable level of risk. When that balance has been fairly struck, a person states no claim by asserting that such risk was visited upon him.

We do not read *Zinermon* as fundamentally altering the balancing of personal and state interests that Mathews prescribed as the test for procedural due process. Rather, the *Zinermon* majority opinion characterizes its analysis as an application of the *Parratt/Hudson* doctrine which in turn implemented Mathews balancing. 110 S.Ct. at 985ff. We emphasize that Dr. Caine received all the process he was due, taking into account the state's powerful interests as well as his private interests. But even if it be assumed *arguendo* that the bias and lack of notice of charges against him were not adequately redressed by the hospital's predeprivation procedures, we would nevertheless find Dr. Caine's claim foreclosed by the *Parratt/Hudson* doctrine as refined by *Zinermon.*

*Zinermon* holds that if "random and unauthorized" conduct of state actors is alleged, the mere existence of even an "adequate" post-deprivation remedy does not satisfy procedural due process where (a) the particular pre-deprivation administrative procedure presents a high risk of erroneous deprivation, and (b) there is a substantial likelihood that further minimal procedural safeguards could prevent the erroneous deprivation. *Zinermon* thus requires a hard look at a *Parratt/Hudson* defense to determine whether the state officials' conduct, under all the circumstances, could have been adequately foreseen and addressed by procedural safeguards. *Zinermon* did not explicitly or implicitly disavow the *Parratt/Hudson* doctrine; instead, it requires case-by-case analysis of the deprivation at issue. *See* 110 S.Ct. at 987–90.

*Zinermon* stated three preconditions for application of the *Parratt/Hudson* doctrine: the deprivation must truly have been unpredictable or unforeseeable; the predeprivation procedures must have been impotent to counter the state actors' particular conduct; and the conduct must have been "unauthorized" in the sense that it was not within the officials' express or implied authority. *Id.* at 987–88. Each of these criteria is established in the case before us.

First, while the deprivation of a doctor's clinical privileges for alleged medical malpractice is foreseeable, the risk of deprivation as alleged here by Dr. Caine was not. His pleadings do not suggest that the hospital's precise and detailed regulations are infirm. Rather, he alleges that the regulations were *violated,* purportedly at every stage, by the dozen or so state actors responsible for enforcing them. The contrast with *Zinermon* is clear, for there the Florida voluntary commitment procedure operated against people who already lacked their full faculties. In that case, the plaintiff was afforded *no* predeprivation process. He was mentally ill and had "voluntarily" admitted himself to a Florida hospital although he was visibly incompetent to do so. *Zinermon* characterizes the risk facing the patient as one of an erroneous deprivation made possible by Florida's voluntary commitment procedures. Any risk to Dr. Caine, however, would have sprung

only from wanton and intentional violations of controlling state regulations.

Second, it is inconceivable that the state could have articulated more explicit procedural safeguards to protect Dr. Caine against the specific risk that his privileges would be suspended because of his peers' anti-competitive motives. *See id.* at 987–88. The hospital regulations state when, how, and for what reasons doctors may be disciplined. They permit immediate suspension only to protect the safety of patients—and then only after an investigation. Further, it is the multimember Executive Committee, not simply the affected doctor's "competitors" in his specialty field, who must take this action. In *Zinermon,* as previously observed, there was no predeprivation process to protect the incompetent mental patient from imprudently committing himself.

Third, it cannot be said that the decisionmakers in this case were "authorized" either to misuse the regulations or to discipline Dr. Caine for improper purposes. Our court has consistently held that mere conclusory allegations of bias do not render infirm otherwise constitutionally adequate procedures. *Holloway v. Walker,* 784 F.2d 1287, 1292–93 (5th Cir.1986); *Laje v. R.E. Thomason Gen. Hosp.,* 564 F.2d 1159, 1162 (5th Cir.1977); *Megill v. Board of Regents of Fla.,* 541 F.2d 1073, 1079 (5th Cir.1976); *Duke v. North Tex. State Univ.,* 469 F.2d 829, 834 (5th Cir.1972). *Zinermon* provides no basis to disavow this rule. Although the hospital's bylaws provide that the initial investigation of a staff doctor

will be undertaken by members of his clinical section, any final disciplinary decision is entrusted to the large, diverse Executive Committee. The regulations governing formal hearings, not invoked here by Dr. Caine, specifically prevent bias based on economic competition or prior investigatory responsibilities. *See* Bylaws Art. VII § 4(a), fn. 2 *supra.* The potential for biased decisionmaking was minimized significantly. In *Zinermon,* by contrast, the voluntary admission of the patient may have been an abuse of judgment by the mental hospital staff, but the exercise of that judgment was specifically condoned by the regulations: "Florida's [statutory scheme] ... gives state officials *broad power and little guidance* in admitting mental patients." 110 S.Ct. at 988 (emphasis added). Such is emphatically not the case here. The Ad Hoc Committee had to persuade the Executive Committee that Dr. Caine's conduct threatened patient safety, a stiff and exacting burden.

The facts that distinguish *Zinermon* from *Parratt/Hudson* do not appear in this case. Even under Dr. Caine's conclusory allegations, the deprivation he suffered was "random and unauthorized." Moreover, there were adequate and prompt post-deprivation remedies available to Dr. Caine. Whether or not suspension is immediate, the hospital bylaws provide opportunity for a formal investigation and evidentiary hearing, possible appeal to the hospital board of trustees, and a final resort to the state courts for prompt judicial review.[6]

---

**6.** For purposes of *Parratt/Hudson,* this judicial review is an "adequate post-deprivation remedy" for random and unauthorized violations of the hospital regulations. Under the statutory review provisions, the aggrieved physician may appeal to the chancery court within 30 days of receiving notice of the final decision to suspend or revoke his medical privileges. *See* Miss.Code Ann. § 73–25–93 (incorporating *id.* § 73–25–27). The statute requires the court to consider whether "the procedures followed by [the hospital] violated its own bylaws for due process." *Wong v. Garden Park Community Hosp.,* 565 So.2d 550, 553 (Miss.1990). If the procedures did violate the bylaws, the chancery court's general equity powers would be available for appropriate redress. *See* Miss.Code Ann. § 73–25–27 (the appeal "shall be conducted as other matters

coming before the [chancery] court"); *id.* § 9–1–19 (chancery courts may "grant injunctions all other remedial writs, in all cases where the same may properly be granted according to right and justice").

Furthermore, the aggrieved physician may pursue an action for damages against any person, including the hospital itself, who is responsible for the violations of the bylaws. The statute grants immunity only for "any action taken *without malice* in carrying out the provisions of [the medical staff bylaw requirements]." *Id.* § 73–25–93(2) (emphasis added). As the Mississippi Supreme Court noted in *Wong v. Garden Park Community Hospital,* "[t]he statutory scheme does not foreclose an independent legal action to determine the propriety of the termination on the facts." 565 So.2d at 553 (quoting

Therefore, according to *Parratt/Hudson*, Dr. Caine was not deprived of property without due process of law.

One final observation supports our position. As the dissenters in *Zinermon* predicted, *see* 110 S.Ct. at 995, 996 (O'Connor, J. dissenting), and as Judge Easterbrook has observed, *see Easter House v. Felder*, 910 F.2d 1387, 1409 (7th Cir.1990) (Easterbrook, J., concurring), the courts of appeals have not found *Zinermon* easy to interpret. Nevertheless, in our research, none of the courts as yet called upon to apply *Zinermon* has found a procedural due process violation in claims of particular regulatory abuses carried out within the framework of controlling regulations. *See, e.g., Easter House*, 910 F.2d at 1396–1406 (en banc); *New Burnham Prairie Homes, Inc. v. Village of Burnham*, 910 F.2d 1474, 1480 (7th Cir.1990); *Katz v. Klehammer*, 902 F.2d 204 (2d Cir.1990); *Amsden v. Moran*, 904 F.2d 748, 754–57 (1st Cir.1990); *Fields v. Durham*, 909 F.2d 94 (4th Cir. 1990); *Plumer v. Maryland*, 915 F.2d 927 (4th Cir.1990); *Coriz v. Martinez*, 915 F.2d 1469, 1470 (10th Cir.1990). Thus, as *Zinermon* counseled case-by-case application of its principles, so it seems at this stage to represent a sui generis situation.

## IV. FIRST AMENDMENT

Dr. Caine also contests the district court's refusal to permit him to amend his complaint and challenge his suspension on first amendment grounds. In the proposed amendment, he alleged that the suspension action was motivated by a desire to silence his opposition to Dr. Hardy's proposal for an exclusive anesthesiology contract and to punish his unsuccessful candidacy for Chief of Anesthesiology. The district court opted to deny the amendment, finding Dr. Caine's allegations failed to state a claim for relief. *See* Fed.R.Civ.P. 12(b)(6). We review *de novo* the legal question whether these allegations state a claim that Dr. Caine's termination violated the first

amendment. If they do, then the district court would have erred by refusing to permit the amendment.

■ Public employees do not, by virtue of their positions, shed their first amendment rights to speak out on matters of public concern. *Pickering v. Board of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). If a public employee's protected speech was the reason for termination, the first and fourteenth amendments afford a claim against the employer. *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 283–84, 97 S.Ct. 568, 574, 50 L.Ed.2d 471 (1977). The threshold legal question in such cases is whether the employee's speech dealt with matters of truly public concern as opposed to matters of purely personal interest or intra-office disputes. *Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983).

■ Taking Dr. Caine's allegations at face value, as we must in reviewing a Rule 12(b)(6) motion to dismiss, it appears that Dr. Caine vocally objected to the award of any exclusive anesthesia contract to Drs. Hardy, Strong, and Wilson "as same would injure and infringe upon his own anesthesia practice in Hinds General Hospital." Further, Dr. Caine ran against Dr. Hardy for chairmanship of the anesthesiology department and lost by one vote. According to Dr. Caine, by the end of March 1988, the three doctors had reached no exclusive contractual arrangement with the hospital, largely because of his objections and those of other anesthesiologists. Dr. Caine's brief declares that "[c]ertainly, the manner in which a public hospital is operated is of significant public concern." The district court, he charges, "guessed" at the time, place, manner, and content of the statements made.

It cannot be denied that the context in which a public employee expresses himself may be relevant to determining whether the speech expressed a matter of "public

*Wong v. Stripling*, 881 F.2d 200, 202 (5th Cir. 1989)). For example, individual physicians who intentionally violated hospital bylaws in order to drive a competitor out of business might be

liable for tortious interference with business relations. *See Galloway v. Travelers Ins. Co.*, 515 So.2d 678, 682–83 (Miss.1987).

concern." *Noyola v. Texas Dep't of Human Resources,* 846 F.2d 1021, 1023 (5th Cir.1988). But context alone cannot transform an inherently self-interested opinion into one that implicates public issues. Had Dr. Caine proclaimed his opposition to Dr. Hardy's exclusive contract proposal from the steps of the Mississippi capitol, the characterization of this speech would not differ. Dr. Caine's alleged remarks concerned solely the internal management of the hospital anesthesiology department and reflected an intra-office dispute rather than an expression of opinion necessary for society to make informed decisions.

One may speculate that the public at large would have an interest in knowing whether Hinds General elected to enter an exclusive contract with only three anesthesiologists. Potential patients might want to know whether or not they would be able to utilize the services of their personal anesthesiologists at Hinds General, but a similarly attenuated argument was raised and rejected in *Connick v. Myers,* 461 U.S. at 148–49, 103 S.Ct. at 1690. The Supreme Court noted that by such reasoning, any activity that occurs within a government office might be deemed a matter of public concern. Such a constitutionalization of primarily intra-office disputes would invite undesirable judicial interference into mundane governmental operations, however, with hardly even a marginal effect on the vigorous debate of public issues secured by the first amendment.

We have rejected this type of argument in our own decisions as well:

> Because almost anything that occurs within a public agency *could* be of concern to the public, we do not focus on the inherent interest or importance of the matters discussed by the employee. Rather, our task is to decide whether the speech at issue in a particular case was made *primarily* in the plaintiff's role as citizen or primarily in his role as employee.

*Terrell v. University of Tex. System Police,* 792 F.2d 1360, 1362 (5th Cir.1986) (emphasis added); *accord Ayoub v. Texas A & M Univ.,* 927 F.2d 834, 837 (5th Cir.1991). Dr. Caine did not object to the award of an exclusive anesthesia contract solely, or even primarily, because of his concern as a citizen for the sound management of his local hospital. Rather, his objections stemmed from his perfectly normal, but private interest as a hospital staff member that his job be as remunerative as possible. In *Terrell*'s terms, Dr. Caine's speech was made in his role as employee.

The scope of this holding is narrow. In many cases, a district court confronted with sparse allegations of a first amendment violation in the government employment context may not be able to evaluate the "content, form and context" until discovery or appropriate motions have fleshed out the allegations of a plaintiff's complaint. This is not such a case, however, for we discern no legitimate basis on which to characterize Dr. Caine's allegations, so clearly dependent upon his personal economic stake in the anesthesiology department, as embodying a matter of truly public concern. The district court did not err in concluding that Dr. Caine's proposed amendment failed to state a claim upon which relief could be granted.

## V. CONCLUSION

We end where we began. Dr. Caine's summary suspension for reasons of patient safety was procedurally safeguarded in such a way as to satisfy fourteenth amendment due process standards, either under the classic *Mathews* test or under *Zinermon*'s wrinkle on the *Parratt/Hudson* doctrine. His opposition to his colleagues' request for an exclusive anesthesiology contract with Hinds County General Hospital was not speech on a matter of public concern protected by the first amendment. The district court therefore properly dismissed his complaint.

AFFIRMED.

JERRE S. WILLIAMS, Circuit Judge, with whom JOHN R. BROWN, Circuit Judge joins, dissenting:

Curtis W. Caine, Jr., M.D. sued M.D. Hardy, M.D. and others on the grounds that the defendants terminated his hospital privileges out of a personal vendetta against him, and in so doing violated his right to procedural due process. Shortly after filing his original complaint, Dr.

Caine attempted to amend his complaint to include a claim under the First Amendment. The district court dismissed Dr. Caine's suit under Federal Rule of Civil Procedure 12(b)(6) and denied his request to file an amended complaint under Rule 15(a). The majority affirms these rulings today. In so doing, the majority acts with unseeming haste in prejudging a case that may have merit. Further, the majority flatly ignores the clear dictates of Rule 12(b)(6) and Rule 15(a). I therefore dissent.

## I.

The facts are adequately set out in the panel opinion, 905 F.2d 858, together with the majority en banc opinion. I emphasize two points the majority glosses over.

First, this case was dismissed pursuant to Rule 12(b)(6). We must therefore accept Dr. Caine's allegations as *true*—not as unsubstantiated allegations. Dr. Caine's complaint does not merely "shine[ ] a different light on the formalities observed," as the majority contends. Instead, the facts alleged in the complaint must be taken as the true light.

Second, because of the Rule 12(b)(6) standard, we must analyze this case as one of a personal vendetta against Dr. Caine, not as a case of a hospital protecting its patients. The majority opinion concludes that Dr. Caine's allegations were merely conclusory. Only if you do not accept them. Our pleading is notice pleading, and Dr. Caine alleged ample facts to support his conclusion of bias. I can only suggest that the Court consider Wright's relatively elementary law school textbook on Federal Courts, 3d Ed. § 68, pp. 319–326. It will find that this careful summary analysis of correct modern pleading is directly contrary to virtually all of the majority opinion's deprecating analysis of Dr. Caine's complaint.

The animus between Dr. Caine and the defendants, as thoroughly alleged in the complaint, began when Dr. Hardy and his two other partners undertook to gain an exclusive contract to become the only three doctors to provide anesthesia services for all of the hospital's patients. This obvious-ly was a move for a monopoly of those services at a public hospital. Dr. Caine vocally opposed such an arrangement. Further, Dr. Caine ran against Dr. Hardy for the chairmanship of the Hinds General Department of Anesthesiology, and lost by only one vote. Shortly thereafter, Dr. Hardy and his partners began telling others that Dr. Caine was a poor doctor. They also sought to have the hospital suspend Dr. Caine's hospital privileges.

An ad hoc investigating committee began procedures to suspend Dr. Caine's hospital privileges. Bias was clearly apparent because Dr. Hardy and one of his partners served on the three person investigating committee. Further, the ad hoc committee did not follow the hospital's bylaws, rules, and regulations. The committee failed to give Dr. Caine the required notice of the hearing and the charges. The ad hoc investigatory committee recommended that the Executive Committee suspend Dr. Caine's hospital privileges. The Executive Committee, of which Dr. Hardy and one of his partners were also members, followed this recommendation. This committee failed to give Dr. Caine notice or opportunity to be heard—thereby violating the medical staff rules. The procedural defaults at all stages are alleged in thorough detail in thirteen pages of the complaint. Thus, we have a case of Dr. Caine's competitors, whom Dr. Caine had publicly criticized and opposed on professional issues, playing a major role in terminating Dr. Caine's privileges without following the required procedures and under what should have been the controlling inhibition of a clear conflict of interest.

All of these facts are denominated by the Court's opinion as resulting in a "conclusory" allegation of bias.

## II.

The majority concludes that Dr. Caine has set out no cause of action under the Fifth and Fourteenth Amendments for two reasons. First, the majority asserts that Dr. Caine received all the procedural due process to which he was entitled according to *Mathews*[7] and *Darlak*.[8] The hospital,

---

**7.** *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

**8.** *Darlak v. Bobear,* 814 F.2d 1055 (5th Cir.1987).

they assert, suspended him under an exigent circumstance, a concern for patient safety, and therefore did not have to afford Dr. Caine further process before it deprived him of his hospital privileges. The Constitution only required the hospital to give Dr. Caine post-deprivation due process, and Dr. Caine only complains that he received inadequate pre-deprivation due process. He therefore asserts no cause of action. This also means that *Zinermon*[9] is inapplicable because no due process rights were violated.

The majority misapplies *Mathews* because it ignores the procedural status of Dr. Caine's case. At the 12(b)(6) stage, we construe all of Dr. Caine's allegations in the light most favorable to him and accept all of his allegations as true. 5A C. Wright & A. Miller, Federal Practice and Procedure § 1363, at 460–61 (1990). Thus, we must accept Dr. Caine's assertion that the hospital terminated his privileges out of revenge—not out of a concern for personal safety of patients. *Mathews* and *Darlak* are therefore inapplicable. *Darlak* and *Mathews* come into play only when there is a valid legal finding that patient safety is at issue. Only then does revenge become an acceptable risk and pre-deprivation due process is not required. Here, there is no such finding. We instead must accept as true Dr. Caine's allegation that the hospital and the other defendants terminated Dr. Caine's privileges as the core of a personal vendetta.

Second, the majority argues that the *Parratt/Hudson* doctrine,[10] not *Zinermon*, applies to this case. According to the *Parratt/Hudson* doctrine, when the conduct of state actors is random and unauthorized, the state cannot foresee, predict, or prevent a deprivation resulting from such conduct. In such a situation, post-deprivation procedure is the only process constitutionally required. *Zinermon* made a strong and sweeping addition to the *Parratt/Hudson* doctrine. Here is one aspect of the en banc court going seriously wrong. Under *Zinermon, Parratt/Hudson* is not applicable when (1) erroneous deprivation is foreseeable, (2) pre-deprivation process is practicable, and (3) challenged conduct is not "unauthorized," in that the "State delegated to [the state officials] the power and authority to effect the very deprivation complained of" by the plaintiff. *Zinermon*, 494 U.S. at ——, 110 S.Ct. at 989–90.

*Zinermon*, not the narrower *Parratt/Hudson* doctrine, applies to this case. The state can be expected to provide pre-deprivation remedies because the three *Zinermon* requirements are present. First, the deprivation is foreseeable and comes at a predictable time—when the hospital began termination proceedings. The state can know when the deprivation occurs because procedures are initiated, just as in *Zinermon*. This is not a case of a single state employee acting on his or her own as in *Parratt* and *Hudson*. The state in fact acknowledges that such a deprivation is foreseeable because it attempted to develop procedural safeguards to protect against erroneous deprivation. *See Plumer v. State of Md.*, 915 F.2d 927, 931 (4th Cir.1990).

Second, pre-deprivation process is practicable because revenge is at issue—at least at this procedural juncture—not patient safety. Dr. Caine did attach to his original complaint a copy of many hospital records pertaining to his termination. He included a copy of a case history which was developed by the investigating committee that charged him with seriously mishandling a patient. Yet Dr. Caine alleges and therefore establishes as fact that this case had been earlier reviewed in a regular "re-credentialing" proceeding and at that time no issue was raised with respect to it by the Credentials Committee or the Executive Committee. We still must take Dr. Caine's case as one addressing revenge and not patient safety. The allegations in the com-

---

9. *Zinermon v. Burch,* 494 U.S. 113, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990).

10. *See Hudson v. Palmer,* 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984); *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), *overruled in part on other grounds, Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986).

plaint are taken as true, not the documents attached to the complaint which are inconsistent with the complaint.

Since the majority considers inconsistent documents outside the complaint, it is engaging in summary judgment procedure without giving Dr. Caine the benefit of filing supplemental sworn evidence. Dr. Caine alleges that he had responses to the charges about the case history in question which prove the charges were advanced as a matter of bias. I remind the Court that "the only information necessary for a decision on [a 12(b)(6)] motion is to be found in the pleading itself; if outside evidence is considered, the motion becomes one for summary judgment." 5A C. Wright & A. Miller, Federal Practice and Procedure § 1363, at 460 (1990) (footnote omitted). The majority ignores the nature of a Rule 12(b)(6) motion. It asks only: do the allegations in the *pleading* state a valid claim for relief? Issues of fact are not decided because the allegations in the complaint are taken as true.

Third, the deprivation was not "unauthorized", "for the state had delegated to its employees 'the power and authority to effect the very deprivation complained of here, ... and also delegated to them the concomitant duty to initiate the procedural safeguards....'" *Plumer*, 915 F.2d at 931 (quoting *Zinermon*, 494 U.S. at ——; 110 S.Ct. at 990); *see also Matthias v. Bingley*, 906 F.2d 1047, 1056 (5th Cir.), *modified on other grounds*, 915 F.2d 946 (5th Cir.1990). In *Parratt* and *Hudson*, on the other hand, "the state employees had no similar broad authority to deprive prisoners of their personal property, and no similar duty to initiate ... the procedural safeguards required before deprivations occur." *See Zinermon*, 110 S.Ct. at 990.

This case significantly differs from *Parratt* and *Hudson*, as the *Zinermon* case demonstrates. The majority generally limits *Zinermon* strictly to its facts. Yet *Zinermon* controls. In the posture of a 12(b)(6) case Dr. Caine's allegations are true. This is a case of bias. Yet, the majority requires Dr. Caine to come forward with *proof* of bias and decides itself that there was little, if any, bias. This is an overt, and indeed blatant violation of Rule 12(b)(6)—we must accept as true Dr. Caine's allegation that the hospital committees were biased. Thus, in Section III of the opinion for the Court we find a meticulous analysis and reliance upon non-facts as to patient safety. They are non-facts because they are not subject to evaluation as to their veracity. The specific requirements of Rule 12(b)(6) have not been met. They are not sworn, they are contrary to the facts as established under Rule 12(b)(6) by Dr. Caine's pleadings, and also Dr. Caine never had the opportunity to counter them.

The defendants never filed a pleading, thus never denied Dr. Caine's allegations. Yet the Court decides the case by ignoring his allegations and giving detailed credence to a patient safety issue which is not raised in the case because the defendants never raised it and the plaintiff's pleadings refute it as a factor.

We cannot conclude what result might occur in this case if this were a summary judgment proceeding or there was a trial. Dr. Caine might well have been able to counter the possible evidence of a threat to patient safety. But he had not the slightest obligation to do so at this stage. His pleadings were based upon a claim that Dr. Hardy's and the other defendants' actions were grounded in bias growing out of a personal political dispute. These are the only facts in the posture of this case, and they *must be accepted as true.*

It is incomprehensible to me that this Court can so totally ignore the certain and inescapable status of this case. Contrary to the literal wording of Section 12(b)(6) and the entire corpus of the law interpreting it, the Court converts the 12(b)(6) proceeding to a trial on the merits and without the slightest authority makes its own evaluation of the case based upon its own creation of evidence that does not exist in the pleadings.

This case in no way limits, modifies, or jeopardizes the rule that a hospital can summarily suspend doctor privileges to protect patients. It does not do so because this is not a case about patient safety—at least at this stage—but instead a case

about a personal vendetta against a doctor. The majority decision allows a hospital to terminate privileges out of bias, call it patient safety, and then fail to provide the required pretermination procedural due process. This holding constitutes a license to any public agency to deprive someone of a special right by stating a ground which would constitute an emergency—with no proof thereof—and then prevail in a Rule 12(b)(6) dismissal. This bootstrap device can be used in spite of allegations, which must be taken as true, that the motives for the deprivation were wholly discriminatory and that the procedures violated the United States Constitution. The deceased Dr. Caine's rights are entitled to total vindication as this case comes to us. I regret that my powers of persuasion are unable to pierce the smokescreen of the Court's groundless and extralegal analysis.

### III.

In Dr. Caine's original petition, he made no First Amendment claim. He later moved for leave of the district court to allow him to file a first amended complaint which included a free speech cause of action. The district court initially granted Dr. Caine's request. The district court later changed its mind and denied the request:

> Finding that the Amended Complaint fails to state a claim upon which relief can be granted, the Court exercises its discretion pursuant to Federal Rule of Civil Procedure 15(a) to deny Caine's Motion for Leave to Amend Complaint. Numerous courts have ruled that leave to amend is properly denied when the complaint, as amended, is subject to dismissal. *See, e.g., Wedgeworth v. Fibreboard Corp.,* 706 F.2d 541 (5th Cir.1983); *Bache Halsey Stuart Shields Inc v. Tracy Collins Bank & Trust Co.,* 558 F.Supp. 1042 (D.Utah 1983).

This action by the district court was plain error. Yet, the majority today agrees with the district court, and completely fails to mention, much less consider, the clear text of the rule governing amendments of pleadings, Federal Rule of Civil Procedure 15(a).

The first sentence of Rule 15(a) provides in relevant part that "[a] party may amend the party's pleading once *as a matter of course* at any time before a responsive pleading is served." (emphasis added.) The defendants have never filed a responsive pleading in this case; only a Rule 12(b)(6) motion was filed.[11] *See Zaidi v. Ehrlich,* 732 F.2d 1218, 1219–20 (5th Cir. 1984); *see also* Fed.R.Civ.P. 7(a). Dr. Caine under all federal procedural authority should have been allowed to amend his pleading once "as a matter of course." Rule 15(a) requires no court permission when no responsive pleading has been filed. The district court thus had no discretion to deny Dr. Caine's request. "[A] party may amend a pleading once *without the permission of the court or the consent of any of the other parties to the action if he does so . . . before a responsive pleading has been served."* 6 C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1480, 574–75 (1990) (footnotes omitted) (emphasis added). It is axiomatic that neither a 12(b)(6) motion nor a summary judgment motion is a "responsive pleading". Dr. Caine did not even need to make a motion to file an amended complaint. He already had that right under Rule 15(a). The fact that Dr. Caine filed a motion to amend did not affect his absolute right to file an amended complaint. "If a party erroneously moves for leave to amend before the time for amending as of course has expired, . . . the amendment should not be handled as a matter addressed to the court's discretion *but should be allowed as of right." Id.* at § 1482, 580 (footnote omitted) (emphasis added); *see also Zaidi,* 732 F.2d at 1220.

The majority completely ignores the clear and simple dictate of Rule 15(a): Dr. Caine could amend his original petition without court permission because no responsive pleading had been filed. Courts at this stage of litigation do not evaluate under Rule 12(b)(6) the right to amend a

---

**11.** In their 12(b)(6) motion, defendants added a routine alternative motion for summary judgment. But the defendants and the court treated the motion as a 12(b)(6) motion throughout, and the court's judgment was based upon 12(b)(6).

complaint, and the district court did not purport to do so. Thus, the district court committed plain error when it prohibited Dr. Caine from filing an amended complaint. The two cases cited by the district court are clearly inapplicable here because in those cases the defendants had filed responsive pleadings. In such a situation, the second sentence of Rule 15(a) applies: "Otherwise a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." Only when a responsive pleading has been filed can the court determine if the amended pleading would survive a motion to dismiss under Rule 12(b)(6).

Dr. Caine wished to amend for an extremely serious purpose—to state and undertake to prove a First Amendment claim. "A state may not discharge an employee for exercising his right to free speech on matters of public concern." *Page v. De Laune*, 837 F.2d 233, 237 (5th Cir.1988); *see also Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 1689, 75 L.Ed.2d 708 (1983). Whether his speech addressed a matter of public concern must be determined by the "content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147–48, 103 S.Ct. at 1690 (footnote omitted). Yet, the majority today countenances denying Dr. Caine the opportunity to develop the whole record because it has decided for him that he could make no claim to have spoken out on a matter of public concern. This conclusion, again, is overt legal error. The alleged and uncontroverted facts reveal a real likelihood that Dr. Caine could make a valid First Amendment claim.

Dr. Caine spoke out about the quality of health care at the public hospital. The quality of health care inescapably is of public concern. *Frazier v. King*, 873 F.2d 820, 825 (5th Cir.), *cert. denied*, — U.S. —, 110 S.Ct. 502, 107 L.Ed.2d 504 (1989). Dr. Caine's outspoken opposition to the Hardy monopoly move can be treated as an unworthy free speech claim only by an inexplicable desire that the case presented to the court were something other than what it is. The majority fastened upon his allegation that his concern was about loss of work. This allegation, establishing a property interest in his right to sue, cannot be found as a self limiting pleading in the light of his proposed amendment raising the free speech issue. Dr. Caine was speaking out concerning the actions of public officials. Further, the actions would create a monopoly and would bar members of the public from using their own doctors in a public hospital. In short, Dr. Caine asked to allege that he undertook to speak out on issues having clear ramifications that deeply involved matters of public concern. Doctors are intimately associated with such matters. The welfare of the patients—about which Dr. Caine spoke—is always a matter of "serious public concern." *Price v. Brittain*, 874 F.2d 252, 258 (5th Cir.1989).

The opinion of the Court denies Dr. Caine the opportunity to assert these claims and develop the record. Instead, it has decided for Dr. Caine what he did and did not say and why. It therefore improperly denies him the chance to develop the content, form, and context of his advocacy. Further, the majority focuses upon motive. A strong element of personal concern necessary to establish the right to sue does not remove speech from the realm of public concern. *See Thompson v. City of Starkville*, 901 F.2d 456, 465–66 (5th Cir.1990). Courts still must fully analyze the content, form, and context of speech as the Supreme Court required in *Connick*.

## IV.

On this record established law requires that the case be reversed and remanded. Dr. Caine's representatives should be granted the chance to develop their claims that the defendants violated Dr. Caine's Constitutional procedural rights under *Zinermon* and the critical free speech right of advocacy as to a matter of obvious public concern. Yet these critical assertions of Constitutional default are treated as trivia by the en banc Court, so much so that no denial or explanation or even answer is permitted. In what appears to be an overwhelming desire in the Court to hold against Dr. Caine, even before the facts

are developed, the Court simply ignores the firmly established law which governs this case. There is no doubt about the controlling law of Federal Rules of Civil Procedure 12(b)(6) and 15(a). So the Court in its wholly inappropriate ad hoc drive to deny whatever rights Dr. Caine claimed and might establish simply ignores the law and the procedural posture of the case. "Such result-oriented decision making can only erode respect for the federal judiciary." *Christophersen v. Allied Signal Corp.*, 939 F.2d 1106, 1137 (5th Cir.1991) (King, J. dissenting opinion).

I must register a strong dissent.