ACCEPTED
14-15-00745-CV
FOURTEENTH COURT OF APPEALS
HOUSTON, TEXAS
10/28/2015 5:19:30 PM
CHRISTOPHER PRINE
CLERK

## NO. 14-15-00745-CV

\*\*\*

## IN THE COURT OF APPEALS
## FOURTEENTH COURT OF APPEALS DISTRICT
## HOUSTON, TEXAS

\*\*\*

FILED IN
14th COURT OF APPEALS
HOUSTON, TEXAS
10/28/2015 5:19:30 PM
CHRISTOPHER A. PRINE
Clerk

### CITY OF ROSENBERG,
**Appellant/Defendant**

### V.

### THE STATE OF TEXAS
**Appellee/Plaintiff**

---

On Appeal from the County Court at Law No. 2
Of Fort Bend County, Texas
Trial Court Cause No. 15-CCV-055144
Honorable Jeffrey A. McMeans, Presiding Judge

---

## APPELLANT'S OPPOSED MOTION FOR
## EN BANC RECONSIDERATION

---

**DENTON NAVARRO ROCHA BERNAL HYDE & ZECH, P.C.**
2500 W. William Cannon Drive, Suite 609
Austin, Texas 78745
(512) 279-6431 Phone
(512) 279-6438 Facsimile

George E. Hyde
State Bar No. 45006157
SCOTT M. TSCHIRHART
State Bar No. 24013655

*ATTORNEYS FOR APPELLANT*
*CITY OF ROSENBERG*

**MAY IT PLEASE THE COURT:**

NOW COMES APPELLANT, the CITY OF ROSENBERG, (hereinafter "Appellant" and/or "the City") and files this Appellant's Opposed Motion for En Banc Reconsideration in accordance with the Texas Rules of Appellate Procedure ("TRAP").

## INTRODUCTION

By this motion for reconsideration en banc filed under Texas Rules of Appellate Procedure 49.1 and 49.7, Appellant asks this Court to reconsider its decision to grant the *Motion of the State of Texas to Dismiss Appeal for Want of Jurisdiction. See Opinion* filed October 13, 2015.

Reconsideration en banc is appropriate in this case because, although the Court correctly identified this to be an issue of first impression in Texas Jurisprudence, the Court's ruling mistakenly concludes that the 2011 Legislative amendments to the Texas Property Code do not make the requirement that the State make a bona fide offer prior to commencement of condemnation proceedings jurisdictional. In fact, the Court incorrectly extended the *Hubenak* decision (*Hubenak v. San Jacinto Gas Transmission Co.*, 141 S.W.3d 172 (Tex. 2004)) by applying it to statutory language that did not exist when *Hubenak* was decided. The City contends that the Texas Legislature intended to completely overhaul the condemnation practices in Texas and to make condemning entities follow the

2

prerequisites set forth in the Texas Property Code prior to initiating a condemnation lawsuit. The Court incorrectly concluded that the abatement remedy set forth in Texas Property Code section 21.047(d) is the sole remedy for the failure of the State to follow the mandatory prerequisites of the condemnation procedure. Moreover, the Court dismissed the City's appeal without giving the parties the opportunity to brief the issues. The City's briefing will establish that the Legislature was, in a string of bills dating back to the *Hubenak* decision, reacting directly to that decision. The City should at the very least be afforded the opportunity to brief issues that the Court correctly indicates are issues of first impression under Texas jurisprudence. Finally, the granting of Appellee's Motion to Dismiss for Want of Jurisdiction effectively deprives the City of its procedural due process rights and makes the 2011 amendments of the Texas Legislature a nullity.

For these reasons, Appellant urges the panel to reconsider its ruling based on the following arguments.

## STATEMENT OF RECONSIDERATION POINTS

Appellant requests reconsideration of the Court's ruling based on the following:

A.    The Court incorrectly concluded that the mandatory language used by the Legislature in the 2011 amendments to Chapter 21 of the Texas Property Code were not intended to be jurisdictional and abrogate the *Hubenack* decision.

3

B. The Court incorrectly extended *Hubenack* to apply to statutory language that the Legislature adopted to change the legislative scheme for condemnation set forth in *Hubenack*.

C. The Court incorrectly concluded that the abatement remedy set forth in Texas Property Code section 21.047(d) is the sole remedy for the failure of the State to follow the mandatory requisites of the condemnation procedure.

D. By granting Appellee's Motion to Dismiss for Want of Jurisdiction, without allowing briefing on the subject, the Court deprives the City of certain procedural due process rights that were intended by the Texas Legislature.

## ARGUMENTS & AUTHORITIES

**A. The Court incorrectly concluded that the mandatory language used by the Legislature in the 2011 amendments to Chapter 21 of the Texas Property Code were not intended to be jurisdictional.**

Page 3-4 of the Court's Opinion contains the conclusion that the 2011 amendments to Chapter 21 of the Texas Property Code were not intended to undermine the *Hubenak* analysis. As a result, the Court extended *Hubenak* to the Legislature's bona-fide-offer requirement. However, the plain language of the statute indicates that the Legislature wanted to change the way condemnations were conducted in Texas and the legislative history supports the argument that these amendments came about as a reaction to the *Hubenak* decision.

The Legislature used mandatory language to require a condemning entity to take certain steps prior to condemning property. The 2011 amendments from Senate Bill 18 included a new Section 21.0113:

**Sec. 21.0113. BONA FIDE OFFER REQUIRED.** (a) An entity with eminent domain authority that wants to acquire real property for a public use **must make**

4

**a bona fide offer to acquire the property from the property owner voluntarily.**

(b) An entity with eminent domain authority has made a bona fide offer if:

(1) an initial offer is made in writing to a property owner;

(2) a final offer is made in writing to the property owner;

(3) the final offer is made on or after the 30th day after the date on which the entity makes a written initial offer to the property owner;

(4) **before making a final offer, the entity obtains a written appraisal from a certified appraiser of the value of the property being acquired and the damages, if any, to any of the property owner's remaining property;**

(5) the final offer is equal to or greater than the amount of the **written appraisal obtained by the entity;**

(6) the following items are included with the final offer or have been previously provided to the owner by the entity:

(A) a copy of the written appraisal;

(B) a copy of the deed, easement, or other instrument conveying the property sought to be acquired; and

(C) the landowner's bill of rights statement prescribed by Section 21.0112; and

(7) **the entity provides the property owner with at least 14 days to respond to the final offer and the property owner does not agree to the terms of the final offer within that period.**

Added by Acts 2011, 82nd Leg., R.S., Ch. 81 (S.B. 18), Sec. 8, eff. September 1, 2011. (emphasis added)

The Court was correct in its conclusion that this is a case of first impression under Texas jurisprudence as it does not appear that any other court has considered whether these provisions are jurisdictional. However, when considering the changes to Section 21.012, it is clear that the Legislature intended these provisions to be jurisdictional:

5

Sec. 21.012. CONDEMNATION PETITION. (a) **If an entity with eminent domain authority wants to acquire real property for public use but is unable to agree with the owner of the property on the amount of damages, the entity may begin a condemnation proceeding by filing a petition in the proper court.**

(b) The petition must:

(1) describe the property to be condemned;

(2) state with specificity the public use for which the entity intends to acquire the property;

(3) state the name of the owner of the property if the owner is known;

(4) state that the entity and the property owner are unable to agree on the damages;

(5) if applicable, state that the entity provided the property owner with the landowner's bill of rights statement in accordance with Section 21.0112; and

**(6) state that the entity made a bona fide offer to acquire the property from the property owner voluntarily as provided by Section 21.0113.**

(c) An entity that files a petition under this section must provide a copy of the petition to the property owner by certified mail, return receipt requested.

Acts 1983, 68th Leg., p. 3498, Ch. 576, Sec. 1, eff. Jan. 1, 1984. Amended by: Acts 2007, 80th Leg., R.S., Ch. 1201 (H.B. 1495), Sec. 4, eff. February 1, 2008. Acts 2011, 82nd Leg., R.S., Ch. 81 (S.B. 18), Sec. 9, eff. September 1, 2011.

The Texas Legislature intended the bona fide offer requirements of Sec. 21.0113 to provide a clear set of rules that a condemning entity must follow in order to determine whether the parties are unable to agree and those mandatory provisions must be complied with prior to filing suit. Otherwise the Legislature's actions in passing Senate Bill 18 had no effect on the condemnation process.

6

The requirement in Sec. 21.012(b)(6), that the condemning entity "state that the entity made a bona fide offer to acquire the property from the property owner voluntarily as provided by Section 21.0113" is also instructive of the clear Legislative intent that the condemning entity could not bring an action without first complying with Section 21.0113. For example, it would be a violation of Texas Rule of Civil Procedure 13 to include a Sec. 21.012(b)(6) statement in a condemnation petition without actually having previously made the bona fide offer as mandated by Sec. 21.0113. See Tex. R. Civ. P. 13 ("Attorneys. . .who shall make statements in pleadings which they know to be groundless or false . . . shall be guilty of contempt."). Moreover Rule 303 of the Texas Disciplinary Rules of Professional Conduct states in relevant part "A lawyer shall not knowingly. . .make a false statement of material fact or law to a tribunal." The Texas Legislature clearly intended that the Sec. 21.012(b)(6) be included in the condemnation, but that the lawyer who signed the pleading would be bound by both the Texas Rules of Civil Procedure and the Texas Disciplinary Rules of Professional Conduct to make certain that the bona fide offer was made prior to the institution of condemnation proceedings. The Texas Legislature would not have intended that attorneys who sign condemnation petitions would do so in violation of these rules.

The legislative history relating to Senate Bill 18 indicates that the Texas Legislature was reacting directly to the *Hubenak* decision in a series of enactments

7

culminating in Senate Bill 18. The House Research Organization, Interim News (May 17, 2010), a true and correct copy of which is attached as Exhibit "A" directly discusses *Hubenak* and the Legislature's reaction:

> Concerns about entities exercising the power of eminent domain providing fair initial offers for condemned property have led to recent attempts to require these entities to make "good-faith offers" at the beginning of the condemnation process and to establish meaningful sanctions when they do not. Supporters of a good-faith offer requirement point to the 2004 Texas Supreme Court decision in Hubenak v. San Jacinto Gas Transportation Company, 141 S.W.3d 172, claiming that case diminished the incentive for condemning entities to negotiate in good faith. That opinion resulted from a number of cases in which property owners claimed that condemning entities did not satisfy the requirement, under Property Code 21.012, that the authorities were "unable" to agree with the owners on the amount of damages before beginning condemnation proceedings. Property owners argued that the requirement could not be met unless the condemning authorities established that they had engaged in "good-faith" negotiations with the owners before filing suit. The court found that the entities in Hubenak each had made a formal offer to purchase the properties and that this was sufficient to meet legal requirements to make an offer before filing suit.
>
> Supporters of raising the standards for what constitutes a good-faith offer say that the current court interpretation of the law allows condemning entities to make low offers knowingly without facing the penalty of paying attorney's fees and having to re-file a case as a consequence. . . . .

The article then describes past legislative efforts, which included the bona-fide offer requirement that resulted in Section 21.0113:

> **Past legislative efforts.** Two previous bills that failed to be enacted would have established requirements for good-faith offers. HB 2006 in 2007 would have require an entity attempting to take a property to make a bona fide offer, defined as an offer that was based on a reasonably thorough investigation and an honest assessment of the

amount of just compensation due to the landowner. It would have allowed a court that found a condemning entity did not make a bona fide offer to dismiss a condemnation suit and require the entity to make such an offer. SB 18 in 2009 would have required a condemning entity to make a bona fide offer meeting several criteria, including obtaining a certified appraisal no higher than the offer made. . . .

*See id.* These provisions made it into Senate Bill 18 and the Legislature clearly intended to abrogate the *Hubenack* decision and put in place a more rigid procedure the condemnor must comply with before filing suit.

The City respectfully requests that the Court rehear and reconsider its decision to grant the State's Motion to Dismiss and allow briefing on these issues of first impression under Texas jurisprudence.

**B.     The Court's incorrectly extended *Hubenack* to apply to statutory language that the Legislature adopted to change the legislative scheme for condemnation set forth in *Hubenack*.**

On page 4 of the Opinion, the Court correctly noted that the *Hubenack* court did not address whether the requirement of a bona fide offer is jurisdictional, and that the issue appears to be an issue of first impression in Texas jurisprudence. Then the Court, without additional discussion, concludes that the 2011 amendments to the Texas Property Code do not appear to have undermined the *Hubenak* analysis.

However, the Court reads too much into the *Hubenak* decision. It's true that Hubenak stands for the proposition that the requirements under the previous version of Texas Property Code § 21.012 are mandatory but not jurisdictional. *See Hubenak v. San Jacinto Gas Transmission Co.*, 141 S.W.3d 172, 183-84 (Tex. 2004).

9

However, it is also clear that under *Hubenak*, a landowner can waive its right to challenge whether the condemnor negotiated in good faith prior to filing the condemnation petition. *See id.* The Court seemed to indicate that all pre-suit requirements of condemnation actions could be waived by the landowner's failure to timely raise a challenge. *See id.*

In the present case, the City did timely raise a challenge to the State's failure to comply with the pre-suit requirements. The City objected in writing to the State prior to the commencement of the suit and raised the issue in a plea to the jurisdiction after the suit was filed. A plea to the jurisdiction is the only appropriate procedural vehicle for the City to use to challenge the State's failure.

Moreover, as previously demonstrated, the Legislature clearly intended to address the perceived abuses under the *Hubenack* decision.

The City respectfully requests that the Court rehear and reconsider its decision to grant the State's Motion to Dismiss and allow briefing on these issues in light of the legislative history and the *Hubenack* court's indication that a landowner could waive all pre-suit requirements by failing to raise a timely challenge.

**C.    The Court incorrectly concluded that the abatement remedy set forth in Texas Property Code section 21.047(d) is the sole remedy for the failure of the State to follow the mandatory requisites of the condemnation procedure.**

On Page 4 of the Opinion, the Court concluded that the Legislature provided an abatement remedy under Property Code Section 21.047(d) shows that the defect

10

(the failure of the State to make a bona fide offer prior to commencing suit) is not jurisdictional. However, nothing in Chapter 21 of the Texas Property Code indicates that abatement is the sole remedy available to a landowner. The present case is in a different procedural posture than the Court considered in *Hubenack*. In Hubenack, the condemnation petitions were filed, the Special Commissioners had made their awards and the landowners timely appealed the awards, and there were opposing motions for summary judgment. *See Hubenack*, 141 S.W.3d at 176-177. The Court noted that there was no language in the previous Sec. 21.012 that made the "unable to agree" requirement jurisdictional. *See id.* at 180.

However, the 2011 amendments to Texas Property Code Sec. 21.0113 and 21.012 were changed to add specific mandatory requirements that a condemning entity must follow prior to filing suit. This was a major departure from the previous version of 21.012(b)(4) that simply stated that the condemnation petition must "state that the entity and the property owner are unable to agree on the damages." When these prerequisites are not met, the entity cannot maintain an action and a plea to the jurisdiction is the proper procedural vehicle to challenge the lawsuit.

The City respectfully requests that the Court rehear and reconsider its decision to grant the State's Motion to Dismiss and allow briefing on these issues in light of the specific changes the Legislative made to Texas Property Code Sec. 21.0113 and 21.012 which added specific mandatory requirements that a condemning entity must

11

follow prior to filing suit and because the Legislature did not provide any changes to Chapter 21 of the Texas Property Code that evidence a legislative intent that abatement is the sole remedy available to a landowner.

**D.** **By granting Appellee's Motion to Dismiss for Want of Jurisdiction, without allowing briefing on the subject, the Court deprives the City of certain procedural due process rights that were intended by the Texas Legislature.**

The Texas Legislature clearly intended that the 2011 amendments to Sections 21.0113 and 21.012 of the Texas Property Code would provide procedural due process rights to landowners. The Legislature changed the requirements under former Sec. 21.012(b)(4) that simply required the condemnation petition to state that "the entity and the property owner are unable to agree on the damages." To specific actions that must be taken before the condemnation petition can be filed and a certification under Texas Rule of Civil Procedure 13 that the provisions contained in Sec. 21.0113 have been met. When the State failed to comply with Sec. 21.0113, a plea to the jurisdiction is the appropriate vehicle to test the jurisdiction of the trial court.

"The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). "Procedural due process considers not the justice of a deprivation, but only the means by which the deprivation was effected." *Caine v. Hardy*, 943 F.2d 1406, 1411 (5th Cir. 1991).

12

The injury that stems from a denial of due process is not the liberty or property that was taken from the litigant, but the fact that it was taken without sufficient process. *See Nasierowski Bros. Inv. Co. v. City of Sterling Heights,* 949 F.2d 890, 894 (6th Cir. 1991). A due process injury is complete when process is denied. *Zinermon v. Burch,* 498 U.S. 113, 125, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990).

If a landowner cannot challenge whether the State has complied with the mandatory pre-suit provisions of Sect. 21.0113 and 21.012 immediately after suit is filed, the landowner is deprived of its ability to effectively challenge the State at all. The State will be able to ignore all of the mandatory pre-suit provisions contained in Sec. 21.0113 and 21.012 with impunity. The State's lawyers will be allowed to sign condemnation petitions in direct violation of Texas Rule of Civil Procedure 13 with no meaningful consequences. Moreover, the courts of the State of Texas will be able to ignore the directives of the Texas Legislature set forth in Senate Bill 18.

The City respectfully requests that the Court rehear and reconsider its decision to grant the State's Motion to Dismiss and allow briefing on these issues in order to give effect to the Texas Legislature's 2011 amendments to the Texas Property Code and in order to preserve the procedural due process rights of Texas landowners.

13

## CONCLUSION

The City of Rosenberg respectfully requests that the Court rehear and reconsider its decision to grant the State's Motion to Dismiss and allow the appeal of the City's Plea to the Jurisdiction to proceed. Accordingly, Appellant asks this Court to reconsider its decision to grant the *Motion of the State of Texas to Dismiss Appeal for Want of Jurisdiction, see Opinion* filed October 13, 2015, and reverse the decision to grant the State's Motion.

## PRAYER

WHEREFORE PREMISES CONSIDERED, Appellant prays that this Court reconsider en banc its decision to grant the Motion of the State of Texas to Dismiss Appeal for Want of Jurisdiction and, after filings of briefs and oral arguments, hold that Appellant is entitled to dismissal of the condemnation lawsuit in the trial court, and for such other relief to which Appellant may show itself to be entitled.

SIGNED this 28th day of October, 2015.

14

Respectfully submitted,

DENTON NAVARRO ROCHA BERNAL HYDE & ZECH, P.C.
2500 W. William Cannon Drive, Suite 609
Austin, Texas 78745
512/279-6431
512/279-6438 (Facsimile)
george.hyde@rampage-aus.com
scott.tschirhart@rampage-aus.com

By: _____
GEORGE E. HYDE
State Bar No. 45006157
SCOTT M. TSCHIRHART
State Bar No. 24013655

*ATTORNEYS FOR APPELLANT*
*CITY OF ROSENBERG*

## CERTIFICATE OF CONFERENCE

Pursuant to Rule 10.1(a)(5) of the Rules of Appellate Procedure, the undersigned certifies that attempts to confer with counsel for Appellee The State of Texas was made on October 26, 2015, and Appellant is filing this motion as opposed.

_____
GEORGE E. HYDE
SCOTT M. TSCHIRHART

## CERTIFICATE OF COMPLIANCE

In compliance with Tex. R. App. P. 9.4(i)(3), this is to certify that the Appellants' Motion for En Banc Reconsideration contains 3,320 words, which does not include the caption, signature, proof of service, certificate of conference, and certificate of compliance.

GEORGE E. HYDE
SCOTT M. TSCHIRHART

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing instrument has been served upon the below named individuals as indicated, and according to the Texas Rules of Appellant Procedure and/or via electronic notification on this the 28th day of October, 2015:

Glorieni Azeredo                                        via electronic notification
Susan Demaraisa Bonnen
Assistant Attorney General
Office of the Attorney General of Texas
Transportation Division
P.O. Box 12548
Austin, Texas 78711-2548

GEORGE E. HYDE
SCOTT M. TSCHIRHART

16

## HOUSE RESEARCH ORGANIZATION
Texas House of Representatives

# Interim News

Number 81-4                                    May 17, 2010

# Legislature may revisit eminent domain issues in next regular session

The Texas Legislature may revisit issues involving eminent domain law during its 2011 regular session. Eminent domain is the authority of a government or private entity to take private property for a public use upon providing adequate compensation to the property owner. This authority is regulated by the Texas Constitution and state statutes. Previous discussions of eminent domain in Texas centered on whether current law adequately protects property owners from unfair and unnecessary takings.

Property Code, ch. 21 governs eminent domain (condemnation) proceedings and provides a three-step process for contesting the taking of property under eminent domain authority. First, an entity with condemnation authority that is unable to agree with a property owner on the amount of damages that should be awarded for a property may file suit in district court or county court-at-law in the county where the property is located. A presiding judge then appoints three special commissioners who reside in the county to award damages based on evidence submitted at a hearing. Finally, if either party appeals the award suggested by the commissioners, the case is submitted to the court with jurisdiction over the case.

Some issues that continue to generate debate include the factors that may be considered in awarding compensation for taken land, how to ensure condemning authorities negotiate in good faith, relocation assistance for property owners, and the extent to which eminent domain authority should be used for slum and blight clearance. Those who oppose further revisions say recent changes in the law have effectively curbed eminent domain abuse in the state and that continuing to restrict the exercise of this authority hampers its legitimate and necessary use.

Since enacting a law restricting the taking of private property for economic development purposes in 2005, lawmakers have considered a range of proposed revisions to

*(See eminent domain, page 2)*

# Veterans mental health courts open in Texas

Last month, Dallas County became the third county in Texas to open a veterans mental health court. A bill allowing counties to create these courts, SB 1940 by Van de Putte, was enacted by the Texas Legislature during the 2009 regular session. Harris County opened the first veterans court in Texas in December, and Tarrant County opened the second last month.

Veterans mental health courts are programs, usually operated within an existing trial court, that integrate mental health and drug treatment for certain military veterans with the processing of criminal cases in which the veterans are defendants. Veterans mental health courts rely on supervisory and treatment models developed by other mental health and drug courts in Texas and around the country. In all such courts, if a defendant successfully completes treatment and other conditions set by the judge, the court may dismiss the charges against the defendant.

One of the distinguishing traits of veterans mental health courts in Texas and nationwide is the inclusion of mentoring sessions with other veterans. These mentors help veterans transition to civilian life and navigate

*(See veterans courts, page 9)*

**Exhibit A**

## Eminent domain, from page 1

the exercise of eminent domain in Texas. In 2007, the governor vetoed one bill, HB 2006 by Woolley, that would have made a number of changes to the use of eminent domain, including narrowing the uses for which land may be taken and revising the processes that govern the taking of private property. Another bill, SB 18 by Estes, which included similar provisions, was approved by the Senate but died in the House during the regular session in 2009. Voters approved a constitutional amendment in 2009 that narrowed the purposes for which property may be taken.

*Two laws enacted recently have sought to restrict the permissible uses of eminent domain authority.*

## Restricting uses of eminent domain

Two laws enacted recently have sought to restrict the permissible uses of eminent domain authority. A law enacted in 2005, SB 7 by Janek, limits the circumstances under which a condemning authority may take land for economic development. SB 7 prohibits a taking that:

- confers a benefit on a particular private party through the use of the property;
- is for a public use that is a pretext to confer a private benefit on a particular private party; or
- is for economic development purposes, unless the development is a secondary purpose resulting from urban renewal activities to eliminate affirmative harms from slums or blighted areas.

The Legislature enacted SB 7 in response to the U.S. Supreme Court's decision in *Kelo v. City of New London*, 545 U.S. 469 (2005), which held that use of eminent domain for economic development purposes was permissible but that states could restrict such authority.

### Public use

Advocates of reigning in eminent domain power said SB 7, while a marked improvement, did not adequately define "public use" or sufficiently limit the use of eminent domain in slum and blighted areas. Under the Texas Constitution, eminent domain authority may be exercised only when land is being taken for a public use, but the definition of "public use" has been defined largely by the courts.

In November 2009, voters approved Proposition 11 (HJR 14 by Corte), amending the Texas Constitution to restrict the use of eminent domain authority to a taking or other damage to a property primarily for the ownership, use, and enjoyment by certain entities. Those entities include the state, a local government, an entity with condemnation authority under state law, or the public at large. The amendment disallowed the taking of property for transfer to a private entity primarily for economic development or to enhance tax revenue. It also required a two-thirds vote of all the members elected to each house for the Legislature to enact a law granting the power of eminent domain to an entity, effective January 1, 2010.

No formal legal challenges to an eminent domain proceeding based on the recently amended public use clause are currently pending. Some say that further limiting permissible public uses of eminent domain in statute may be necessary in order to define key terms and respond to potential court interpretations of language in the Constitution.

### Slum and blight

The authority to acquire property for economic development, including the removal of slum and blight, remains a subject of controversy. The Legislature has recently debated whether to restrict the use of eminent domain authority to acquire property identified as "slums" or "blighted areas." Proposition 11, the constitutional amendment adopted in 2009, allows a taking of property to eliminate blight on a particular parcel only, rather than a larger area designated as "slum" or "blighted."

The Texas Urban Renewal Law, enacted in 1987, allows local authorities to exercise eminent domain to

**Exhibit A**

acquire property within an urban renewal plan area that a municipality designates as a slum or blighted. Property may be condemned in a section of a designated urban renewal area where the municipality has determined that at least 50 percent of structures are dilapidated and show other characteristics of blight.

In 2007 and 2009, the Legislature considered revising the authority to condemn property in so-called blighted or slum areas, but none of the proposed statutory revisions became law. HB 3057 by Callegari in 2007 and SB 18 by Estes in 2009 would have prohibited a municipality from exercising powers under the Urban Renewal Law unless its governing body determined that each unit of property in an area met the definition of "blight." Both bills would have required written notice to property owners before a blighted area was designated and would have allowed a property to be designated as blighted only if the owner took no reasonable measures to remedy hazardous conditions. A municipality wishing to exercise eminent domain authority in an urban renewal area not only would have had to determine that each property in the area met the definition of blighted — also a provision of Proposition 11, the constitutional amendment approved by voters in 2009 — but also would have had to reaffirm the designation on an ongoing basis.

Under Proposition 11, condemnation for a public use includes a taking intended to eliminate blight on a particular parcel only. It makes no allowances for taking property due to the conditions of surrounding properties, calling into question the constitutionality of provisions of the Urban Renewal Law that authorize this practice.

Supporters of restricting the use of eminent domain for slum and blight say current law allows municipalities to seize the properties of established residents and businesspeople based on a questionable designation of their property as "blighted." This often arbitrary designation, they say, undermines individual property rights through an overly broad definition of acceptable property maintenance and appearance. This can be a means of displacing working class and middle class residents and businesses for enterprises that generate more tax revenue.

Opponents of restricting the use of eminent domain for slum and blight say proposed limits would create obstacles that effectively eliminate a municipality's authority to designate a blighted area and promote urban renewal through eminent domain. They say this would diminish their ability to improve the quality of life of residents who need the most assistance.

## Rights of property owners

Another issue centers on the rights of property owners whose land is taken under eminent domain authority.

HB 2006, which Gov. Perry vetoed in 2007, and SB 18, which was approved by the Senate but died in the House in 2009, would have expanded compensation for property owners, required condemning entities to negotiate in "good faith," and allowed property owners to repurchase taken property that had not been put to a public use within 10 years.

### Compensation for access to transportation

The factors that may be considered in awarding compensation to a property owner facing condemnation have been a subject of ongoing debate. State law allows owners of property subject to eminent domain to seek compensation for their property in court. In determining the amount of compensation, the court may consider certain evidence on the value of the property being condemned and net damages to any remaining property not taken. A particular focus of debate has been whether to allow damages for the impact of diminished access to transportation on the remaining property when a portion of property is taken.

*Diversion of traffic.* In a key Texas Supreme Court case in 1993, *State of Texas v. Schmidt*, 867 S.W.2d 769, two property owners in Austin filed for additional

> *The factors that may be considered in awarding compensation to a property owner facing condemnation have been a subject of ongoing debate.*

damages as a result of a State Highway 183 construction project that involved elevating lanes and taking seven feet of their property for right of way. The court found that the land owners, a portion of whose property was taken for road expansion, were not entitled, under Property Code 21.042(c), to compensation for diminished property value resulting from a diversion of traffic, increased circuity of travel to the property, reduced visibility to passersby, or inconvenience from construction that was shared in common with the general community.

**Diminished or impaired access.** In May 2009, in *State of Texas v. Bristol Hotel Asset Co*, 293 S.W.3d 170 (2009), a hotel in San Antonio that lost a portion of its property for a road expansion sought damages for loss of a driveway and temporary loss of parking spaces due to construction. Overruling the appellate court in San Antonio, the Supreme Court found that the damages cited by the hotel were not compensable under Texas law because reasonable access to the property remained and the reduced access cited by the hotel did not rise to the level of a "material and substantial" impairment.

In 2008, the Texas Supreme Court in *State of Texas v. Dawmar*, 267 S.W.3d 875 (2008), had found that regardless of whether the loss of access to the abutting major highway changed the remainder property's "highest and best use" from commercial to residential and thereby diminished its value, that did not constitute a "material and substantial" impairment because access to other public roads remained.

**Past legislative efforts.** Two bills recently debated in Texas would have revised the factors that may be considered in determining the value of property taken through eminent domain. The bills would have allowed evidence of the impact on the market value of remaining property when access was diminished or impaired.

HB 2006, considered in 2007, would have required that, for the purpose of determining compensation, evidence be considered on diminished access to a

*Two bills recently debated in Texas would have revised the factors that may be considered in determining the value of property taken through eminent domain.*

highway from the remaining property due to a state highway project, to the extent that it affected the property's market value. The bill also would have defined market value as the price a property would bring when sold by a willing seller to a willing buyer. SB 18, considered in 2009, would have allowed evidence on a material impairment of direct access onto or off of the remaining property to the extent that it affected the property's market value. It would not have allowed consideration of circuity of travel or diversion of traffic that was common to other properties, upholding the legal distinction identified in *Schmidt*.

In vetoing HB 2006 in 2007, Gov. Perry said allowing consideration of evidence on diminished access and other damages to a landowner's remaining property due to the exercise of eminent domain would result in unacceptable higher costs to taxpayers. The governor said the change would have added more than $1 billion in extra costs to taxpayers by creating a new category of damages after property owners already had received fair market value for taken land. Requiring large payments for properties that continued to have access to transportation that was only diminished, but not eliminated, would have made many key public improvements prohibitively expensive, he said.

Critics of the veto of HB 2006 said the rights of Texans subject to eminent domain would have been enhanced by allowing fair payment for demonstrable damages to property. The bill would have clarified the range of acceptable damages that could be considered and would have accounted for the actual impact of takings on remaining property, which would promote fair negotiations from the outset. This, critics said, would have reduced excessive litigation that often results when condemning authorities make minimal offers based on a narrow range of factors affecting market value. Critics of the veto said the bill would have restored balance to an unfair process that gives advantages to condemning authorities, and it would have done so without any known cost having been identified by the Legislative Budget Board.

**Exhibit A**

### Right to repurchase

Property owners have sought authority to repurchase property at the original price they were paid by a condemning authority when their former property is not used after a certain period for the public use for which it was taken. Current law allows a property owner to repurchase land taken through eminent domain for a public use that is canceled before the 10th anniversary of the date the property was acquired. The possessing governmental entity must offer to sell the property to the previous owner or the owner's heirs for the fair market value of the property at the time the public use was canceled, not at the original price paid by the entity.

To establish the constitutional authority for the right of repurchase at the original price paid, voters approved Proposition 7 in 2007 (HJR 30 by Jackson), authorizing governmental entities to sell land taken through eminent domain back to the former owner, the owner's heirs, or other successors, at the price the entity paid when acquiring the property if:

- the public use for which the property was acquired has been canceled;
- no actual progress has been made toward the public use during a prescribed period of time; or
- the property is unnecessary for the public use.

A constitutional amendment was required to override the prohibition against a governmental entity granting anything of value to an individual or corporation unless otherwise specified in the Constitution.

HB 2006, which was vetoed by the governor in 2007, and SB 18, which died in the House in 2009, included a provision that would have implemented the constitutional amendment by allowing a property owner whose land was acquired for a public use that has since been cancelled or failed to progress to repurchase their property at the original price the condemning entity paid. Only the original owners and their heirs could have repurchased the property. The right of repurchase would have applied if the public use for the property were canceled or the governmental entity failed to begin operation or construction of the project within 10 years. If such legislation were enacted, it would allow the landowner to receive any appreciation in value accrued between the time the property was condemned and when it was repurchased by the landowner.

Supporters of allowing property owners to repurchase their property at the original price said it would create a disincentive against the speculative exercise of eminent domain authority by condemning entities. Condemning entities would be strongly discouraged from acquiring land through eminent domain for which they did not have immediate plans. Takings carried out on a speculative basis deprive owners of the future value of the property, and the option to repurchase at the original price would help rectify this grievance.

Opponents of allowing property owners to repurchase their property at the original price said it would allow "double recovery" for eligible property owners who had undergone eminent domain proceedings. This would confer a windfall on property owners who were compensated adequately for the original taking, they said. An owner who was eligible to repurchase at the price originally paid could accrue all the equity from appreciation of the value of the property since the time of the original taking without having to pay property taxes, maintenance expenses, and other costs normally incurred as part of property ownership.

### Good-faith offers

Concerns about entities exercising the power of eminent domain providing fair initial offers for condemned property have led to recent attempts to require these entities to make "good-faith offers" at the beginning of the condemnation process and to establish meaningful sanctions when they do not. Supporters of a good-faith offer requirement point to the 2004 Texas Supreme Court decision in *Hubenak v. San Jacinto Gas Transmission Company*, 141 S.W.3d 172, claiming that case diminished the incentive for condemning entities to negotiate in good faith. That opinion resulted from a number of cases in which property owners claimed that condemning entities did not satisfy the requirement, under Property Code 21.012, that the authorities were "unable" to agree with owners on the amount of damages before beginning condemnation proceedings.

Property owners argued the requirement could not be met unless condemning authorities established that they had engaged in "good-faith" negotiations with the owners before filing suit. The court found that the entities in Hubenak each had made a formal offer to purchase the properties and that this was sufficient to meet legal requirements to make an offer before filing a suit.

Supporters of raising the standards for what constitutes a good-faith offer say that the current court interpretation of the law allows condemning entities to make low offers knowingly without facing the penalty of paying attorney's fees and having to re-file a case as a consequence. Supporters say much expense and hardship could be avoided if condemning authorities made a fair offer for a property upfront. Many property owners accept initial offers because they fear the towering legal fees, time, and personal hardship that attend fighting for a fair award in court. An owner who is offered $2,000 an acre for land that has a market value of $3,000 an acre, for instance, may conclude that the difference is not worth a protracted legal fight.

*Past legislative efforts.* Two previous bills that failed to be enacted would have established requirements for good-faith offers. HB 2006 in 2007 would have required an entity attempting to take a property to make a bona fide offer, defined as an offer that was based on a reasonably thorough investigation and an honest assessment of the amount of just compensation due to the landowner. It would have allowed a court that found a condemning entity did not make a bona fide offer to dismiss a condemnation suit and require the entity to make such an offer. SB 18 in 2009 would have required a condemning entity to make a bona fide offer meeting several criteria, including obtaining a certified appraisal no higher than the offer made. A court finding that such an offer had not been made could have required a condemning entity to pay costs and reasonable attorney's fees incurred by the property owner directly related to the failure to make a bona fide offer.

*Distinguishing good-faith offers.* Recent debate on good-faith offers has centered on how to distinguish good-faith offers from those aimed at coercing property owners into settling on an unfair price to avoid legal fees and hassles.

Some have proposed measuring the initial offer against the final award determined by special commissioners after court proceedings. They say the mere existence of an appraisal does not ensure a fair offer, as appraisals may vary widely based on the factors included in determining market value. Supporters of a provision to measure the initial offer against the final award say the final offer should not vary by more than a certain percent from the initial offer, perhaps 15 or 20 percent. Initial offers more than 15 or 20 percent lower than a final judgment should be *prima facie* evidence of bad faith. Supporters of such a provision say a strong, demonstrable measure such as a minimal variance percent is the only true means of ensuring condemning entities make good-faith offers upfront. Provisions that can be minimally satisfied on paper by ensuring certain administrative requirements are met do little to ensure a fair initial offer.

Opponents of a good-faith offer requirement based on the variance between initial and final offers say such a provision is too subjective and expects condemning authorities to predict a court's behavior. They say it is impossible to predict how the special commissioners appointed by a court might decide a particular case. A condemning entity should not be held accountable for not predicting the exact market value of a property in a context of imperfect information.

## Eminent domain process

Lawmakers have debated several revisions to the process for exercising eminent domain authority in recent years, including when an entity must disclose its authority and intention to take a property, whether to require condemning authorities to provide relocation assistance to displaced property owners, and the granting of statutory authority to use the power of eminent domain. Supporters of changing the process say property owners often are overwhelmed by the complexity of eminent domain proceedings and unaware of their rights.

### Disclosure of intent

Recent legislation has involved changes to notice and the disclosure of intent requirements for taking property.

Exhibit A

HB 1495 by Callegari, enacted in 2007, requires an entity with eminent domain authority to provide a landowner's bill of rights to a property owner before initial negotiations to acquire property. As required by the law, the Attorney General's Office drafted the landowner's bill of rights to notify property owners of their rights in eminent domain proceedings under state law, including the right to a hearing and to appeal the offer made for the property. The bill of rights is available online at http://www.oag.state.tx.us/agency/landowners.shtml. In 2009, the Legislature followed up with HB 2685 by Callegari, which specified that an entity must provide a copy of the bill of rights at least seven days before making a final offer to purchase a landowner's property.

HB 2006 in 2007 and SB 18 in 2009, which were not enacted, would have prohibited an entity seeking to acquire property from including a confidentiality provision in an offer or agreement to possess property. The intent was to prevent such entities from keeping key information, such as an appraisal, from property owners and other interested parties. They also would have required an entity that was not subject to open records laws but was authorized to exercise eminent domain, such as a private utility, to adhere to open records laws related to condemnation proceedings if records were requested by an affected property owner. The bills would have allowed a court to award a person who did not receive requested documents reasonable attorney's fees to be paid by an entity that refused to produce the requested information.

### Relocation assistance

The Legislature also has considered proposals to require assistance for people displaced by a taking of property. The federal Uniform Relocation Assistance

## Groundwater raises regulatory takings issues

The Texas Supreme Court is now considering a case that addresses how regulations affect property owners' rights in groundwater beneath their property and what may constitute a "regulatory taking" of property, meaning a regulation that restricts use of property to such an extent that it amounts to a taking of value that must be compensated.

In *Edwards Aquifer Authority v. Day*, property owners claim that the Edwards Aquifer Authority effectively abridged their property rights without compensation by permitting them to pump only 14 acre-feet of water from the Edwards Aquifer beneath their property. The case gained prominence when, overruling a district court, the Fourth Court of Appeals in San Antonio ruled that groundwater was a vested right that conveys to the property owner. The Texas Supreme Court heard oral arguments in the case in February.

The case has generated substantial interest among both authorities that regulate groundwater and landowner organizations. Debate on the takings issue in the case has centered on whether owners' interest in groundwater beneath their property is a vested property right protected under the Texas Constitution's prohibition against taking property for a public use without adequate compensation (Art. 1, sec. 17).

Landowner organizations say an interest in groundwater is a vested, constitutionally protected right and that this has been affirmed historically by the courts, attorney general opinions, and in statute. Groundwater conservation districts say that while landowners possess some rights in groundwater beneath their property, it does not amount to a constitutionally protected, vested right and is therefore subject to regulatory limitation without compensation.

Exhibit A

Act (URAA) requires support for property owners displaced as part of projects that receive federal assistance, but this does not extend to takings where no such funds are involved. Current law in Texas permits a governmental entity to provide a relocation service and issue relocation payments in keeping with federal guidelines for an individual displaced by eminent domain.

Two bills previously considered but not enacted would have required relocation assistance. HB 2006 in 2007 would have required governmental entities to provide relocation assistance and payments to displaced property owners. SB 18 in 2009 would have required assistance payments and allowed special commissioners to consider evidence on whether a condemnation required the relocation of a homestead or farm and how much compensation would be necessary to allow the property owner to have a comparable standard of living or to be able to operate a comparable farm.

Supporters of requiring relocation assistance say assistance should not be limited to those projects that involve federal funding. People displaced by eminent domain, they say, are subjected to hardship and financial damages — such as moving a residence or business — that are not captured under current law determining adequate compensation. Opponents of required relocation assistance say terms such as "comparable standard of living" are too subjective and threaten to add unreasonable costs to taxpayers.

## Who may exercise eminent domain

Recent efforts to revise eminent domain practice have included increasing requirements that must be met for empowering entities to take property and documenting which entities are empowered to use eminent domain in Texas. These efforts stemmed from a concern that it was too easy for an entity to be granted eminent domain authority and that some entities may possess it unnecessarily.

Proposition 11, the constitutional amendment adopted in 2009, raised the bar on granting the power of eminent domain to new entities by increasing the number of votes in each house of the legislature necessary to grant the power of eminent domain from a simple majority to two-thirds of all members. Supporters of this measure said that the power of eminent domain should be granted only if necessary and increasing the support threshold in the legislature would help protect against unnecessary expansions of this power.

Other initiatives have attempted to catalogue exactly what entities have this authority and for what purpose. SB 18, which died in the House, would have required entities created before 2010 to submit a letter to the comptroller acknowledging their authority to exercise the power of eminent domain in the state and identifying the legal source for that authority. The comptroller would have used the responses to generate a report on the entities and the source of their authority. Entities that did not submit this information to the comptroller would have their power of eminent domain revoked, in effect creating an exclusive list of entities possessing the power of eminent domain in the state.

In 2006, the Texas Legislative Council released a publication with a list of the types of entities that have the power of eminent domain and listing statutes that grant, prohibit, or restrict an entity's exercise of this power. The publication is available at http://www.tlc. state.tx.us/pubspol/EmDomain.pdf.

— *by Andrei Lubomudrov*

**Exhibit A**

*Veterans courts*, from page 1

benefits, health services, and other help offered by the federal Veterans Administration (VA) and other service providers. It often takes a participant between 12 and 18 months to graduate from veterans mental health court programs.

Under SB 1940, two or more Texas counties may establish a regional veterans mental health court to cover participating counties. Most of these courts will partner with existing or expanding treatment programs that are run and paid for by the VA.

According to the Texas Veterans Commission, in addition to the new programs in Harris, Tarrant, and Dallas counties, El Paso and Travis counties are in the process of setting up veterans mental health court programs, while Bexar, Denton, Fannin, Hidalgo, and Orange counties are actively planning them. New York,

Colorado, Nevada, Illinois, California, Oklahoma, and Alaska all have some kind of problem-solving court for defendants who are veterans, according to the National Conference of State Legislators.

## Problem-solving courts

The first veterans court in the United States, created in Buffalo, New York in January 2008, was modeled after other "problem-solving courts," such as drug courts, that divert defendants with underlying addictions or mental health problems away from incarceration and into treatment. Other kinds of problem-solving courts in the United States target certain criminal or chronic behavior problems, such as domestic abuse, DWI, or homelessness. Few of these programs are stand-alone courts. Most are separate programs within a court of general jurisdiction or a criminal court (*For more on problem-solving courts in Texas, see below.*)

## Other problem-solving courts in Texas

Texas has a variety of problem-solving courts, the most common being drug courts. Drug courts are programs, usually operating within a district court or a county court at law, that divert from incarceration into treatment certain defendants whose substance abuse was a significant cause of the alleged criminal behavior. Drug courts supervise treatment for defendants and use progressive sanctions to enforce compliance with the program. They also may require restitution to victims, community service, and other counseling. Other examples of problem-solving courts in Texas, besides veterans mental health courts, include family drug treatment, mental health, domestic violence, homeless, teen, truancy, and tobacco courts. These other problem-solving courts follow the drug court model of intensive supervision and treatment of the underlying behavior or addiction that is contributing to the criminal behavior that brought the defendant to court. Most of these problem-solving courts are either created explicitly by statute or created by a county with statutory authorization. Creating these courts requires coordination among existing local courts, district attorneys, treatment providers, and the county commissioners courts that oversee their budgets.

In 2001, the 77th Texas Legislature enacted HB 1287 by Thompson, which required the large urban counties of Bexar, Dallas, El Paso, Harris, Hidalgo, Tarrant, and Travis to establish drug courts. It also authorized county commissioners courts in smaller counties to establish them. According to the Office of Court Administration, 91 drug court programs either have been established or are being developed in Texas. A 2002 study by the SMU Department of Economics found that drug court graduates had a lower recidivism rate than either drug court dropouts or those who did not participate in drug courts at all. Texas drug courts are funded through grants and participant fees. Many rely on federal, state, and private grants for start-up and operational costs. The criminal justice division of the Governor's Office said it expects to award about $6 million in grant funds to Texas drug courts during fiscal 2010-11.

Veterans mental health courts are the newest kind of problem-solving court. They are intended to address chronic behavioral, dependency, or mental health issues that may underlie a veteran's criminal behavior. These courts work through intensive supervision of a veteran's treatment, meeting with the veteran and treatment providers and sometimes requiring drug testing. In many programs, if a judge is satisfied with a defendant's progress in treatment and compliance with other conditions set by the court, the judge may expunge, seal, or destroy all records of the criminal behavior.

Supporters of problem-solving courts say they reduce the recidivism rate for defendants who participate in them. For example, in 2005, the U.S. General Accountability Office (GAO) issued a report concluding that while drug courts are more expensive to run than regular courts, they result in dramatic cost savings to governments over time because they reduce costs for law enforcement and case processing and reduce the number of crime victims. A 2006 study in *The Journal of Psychoactive Drugs* of nine California drug courts reported that the recidivism rate of drug court graduates was less than that of the general population of defendants. In that study, the re-arrest rate for the same or similar offenses was 17 percent for those who successfully completed the drug court's required treatment regimen, 29 percent for all those who participated, and 41 percent for comparable drug offenders who did not participate. The GAO found similar results in studies of drug courts in other states.

Critics of problem-solving courts say study results that show lower recidivism rates for graduates of these courts are no surprise. These courts are staffed by dedicated judges with the time and funding needed to closely supervise defendants who are specially chosen to participate. These courts have enhanced staff levels, including additional social workers, highly trained court managers, and access to experienced treatment professionals and probation officers. Critics of problem-solving courts say it would be better to devote such resources to all existing courts than to create "boutique courts" for certain groups. Some victim protection groups believe that these courts may take attention away from protecting victims. Incarceration protects society from further harm, and diversion programs might release dangerous individuals back into society,

they say. In addition, under SB 1940, a veterans mental-health court judge may expunge a defendant's criminal record, making it difficult for courts and law enforcement to track histories of criminal behavior.

## Veterans mental health courts in Texas

Three veterans mental health courts are currently operating in Texas. Harris County's was the first to open in December 2009 and currently oversees 20 defendants. The second, in Tarrant County, opened in April of this year and oversees 40 defendants. The third, in Dallas County, also opened in April and expects to keep a rolling average of between 50 and 100 defendants in its program.

### Eligibility

Under SB 1940, to be eligible to participate in a veterans mental health court in Texas, a defendant must be a veteran or a member of the U.S. armed forces. The defendant also must suffer from a brain injury, mental illness, or mental disorder, such as post-traumatic stress disorder or depression, that resulted from service in a combat zone or a similar hazardous duty area. The affliction must have materially affected the defendant's criminal conduct that is at issue.

SB 1940 grants judges in veterans mental health courts wide discretion to consider evidence that would establish a service record, addiction, or illness and how those conditions may have affected the alleged criminal conduct. An eligible defendant may decide whether or not to participate in a veterans mental health court program but may participate only if the prosecution consents. If the prosecution does not consent, the defendant will be processed through normal criminal proceedings.

### Jurisdiction

SB 1940 allows counties to create veterans mental health courts to hear all felonies and misdemeanors, although few grant such wide jurisdiction. Harris County's veterans court program, the first in Texas, is administered by a criminal district court. The jurisdiction of the veterans court includes both felonies

**Exhibit A**

and misdemeanors and can include violent offenses, although not sexual offenses or most 3(g) aggravated offenses, such as murder or aggravated robbery. Tarrant and Dallas counties allow only misdemeanor property offenses to be heard, as will Travis and other counties planning to establish veterans mental health courts.

Texas counties establishing these courts are expected to follow the models for drug courts, in which a county that plans to allow both felonies and misdemeanors to be heard places the program in a district court with general or criminal jurisdiction. If a county plans to allow only misdemeanors, it may also place the program in a statutory county court.

Other states have different approaches to veterans courts. Some states limit their courts to property crimes or exclude serious violent offenses, while some states explicitly allow these courts to hear all misdemeanors and felonies.

Veterans advocates and treatment providers, such as the VA, say veterans courts should be allowed to adjudicate more serious crimes. They say existing treatment programs can successfully address issues underlying serious crimes, such as DWI and some domestic violence. They also argue that veterans who commit felonies are those most in need of the closely supervised treatment regimens that a veterans problem-solving court can provide.

### Funding mechanisms

SB 1940 allows veterans mental health courts to collect a fee of up to $1,000 from the defendant as well as additional fees to cover testing, counseling, and treatment expenses. The fees must be based on the veteran's ability to pay and may be used only for purposes specific to the veterans mental health court.

The criminal justice division of the Governor's Office offers seed grants to help Texas counties establish veterans mental health courts. These grants are limited to courts that hear misdemeanor property crimes. So far, the criminal justice division has awarded $200,000 in grants to Tarrant County's veterans mental health court program and is assessing other applications.

At the federal level, in spring 2009, bills were introduced in the U.S. House of Representatives and the U.S. Senate that would provide federal grants to veterans court programs for non-violent offenses. Both were referred to committee, where they currently are pending.

## Debate on veterans courts in Texas

**Supporters of veterans courts in Texas** argue that creating veterans mental health courts allows these courts to develop expertise in mental health and drug addiction treatment for veterans that maximize their chances of recovering and reintegrating into society. The judges, attorneys, and case workers in these courts also become experts in navigating VA benefits and treatment for which a defendant might be eligible. Courts without this expertise may not be as successful at helping veterans reintegrate and avoid reoffending.

Supporters say the Texas law tailors eligibility for veterans courts to a narrow group of veterans who have earned access to diversion programs. Under SB 1940, only veterans with an underlying mental illness that was caused by combat duty are eligible, and they may participate only with the consent of the prosecution. In Texas, access to the program is not based solely on veteran status but is determined on a case-by-case basis. No veteran is automatically admitted.

Supporters say veterans mental health courts are needed because veterans make up a significant portion of county jail populations in Texas. According to a 2007 study by the federal Bureau of Justice Statistics, 10 percent of those incarcerated in state prisons and jails in the United States are veterans. Even if veterans courts cannot treat all defendants with similar underlying problems, they will open up space in existing local treatment programs by transferring eligible veterans to programs run by the VA. A major benefit of veterans mental health courts is that the VA will be the treatment provider in most cases, which should result in significant savings to local governments. Local governments historically have had difficulty in establishing problem-solving courts because of the high cost of treatment.

Opponents of veterans courts in Texas say these courts are not necessary because existing courts can handle any special needs a veteran might have. Under the U.S. and state constitutions, Texas prosecutors already have wide discretion in whether and how to prosecute a crime. They consider a veteran's prior service and, where appropriate, use pre-trial diversion and other programs to get veterans back on their feet again.

The American Civil Liberties Union has spoken out against the veterans court programs in Colorado and Nevada, saying they grant veterans certain criminal defense rights that other defendants do not have. Veterans courts that cover only combat veterans exclude both other veterans and non-veterans who have similar mental illnesses, they say. For example, a police officer might also suffer from work-related post-traumatic stress disorder, commit a crime, and lose the right to carry a firearm and a license to be a peace officer. This disparate treatment of similar defendants based on status could violate the Equal Protection clause of the U.S. Constitution, opponents say.

*— by Tom Howe*

## HOUSE RESEARCH ORGANIZATION



### Steering Committee:

David Farabee, *Chairman*
Bill Callegari, *Vice Chairman*
Drew Darby
Harold Dutton
Dan Gattis
Yvonne Gonzalez Toureilles
Carl Isett
Susan King
Jim McReynolds
Jose Menendez
Geanie Morrison
Elliott Naishtat
Rob Orr
Joe Pickett
Todd Smith

John H. Reagan Building
Room 420
P.O. Box 2910
Austin, Texas 78768-2910

(512) 463-0752

*www.hro.house.state.tx.us*

### Staff:

Tom Whatley, *Director;*
Laura Hendrickson, *Editor;*
Rila Barr, *Office Manager/Analyst;*
Catherine Dilger, Kellie Dworaczyk,
Tom Howe, Andrei Lubomudrov,
Carisa Magee, Blaire Parker, *Research Analysts*